# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FABIAN WADE,

    Plaintiff,

    v.

KAY JEWELERS, INC., STERLING JEWELERS, INC., GGP, INC., AND JANE & JOHN DOES, 1–5

    Defendants.

No. 3:17-cv-990 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

This suit arises out of a March 18, 2017 incident at the Buckland Hills Mall in Manchester, Connecticut, in which employees at a Kay Jewelers store misidentified Plaintiff Fabian Wade ("Wade") as a criminal suspect and summoned mall security, which then alerted the Manchester police. Wade was then stopped and briefly questioned by the police before he was allowed to proceed on his way. Wade sued the owner of the Kay Jewelers store, Defendant Sterling Jewelers, Inc. ("Sterling"), the owner of the Buckland Hills Mall, GGP, Inc. ("GGP"), and numerous Jane and John Does alleged to be security guards at the mall or employees of Sterling. (ECF No. 36.)[1] GGP in turn brought a third-party complaint against the employer of mall security, Professional Security Consultants, Inc. ("PSC"). (ECF No. 57.) I previously granted in part and denied in part Sterling, GGP, and PSC's motions to dismiss. (ECF No. 105.) As a result, Wade has four remaining claims against Sterling, all under state law[2]: (1) false imprisonment; (2) defamation *per*

---

[1] I previously denied Wade's motion for leave to amend his complaint to identify the John and Jane Does because Wade was not diligent and because allowing the amendment would prejudice defendants. (ECF No. 94.) I now dismiss Wade's claims against the John and Jane Does and direct the Clerk to terminate them from the case. *See Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997) ("It is a general principle of tort law that a tort victim who cannot identify the tortfeasor cannot bring suit.").

[2] In response to this Court's order, Wade recently filed a statement on the docket setting forth sufficient facts for this Court to exercise diversity jurisdiction over the action. (ECF No. 113.)

*se*; (3) negligent infliction of emotional distress; and (4) negligent supervision. (*Id.* at 29.) Sterling now moves for summary judgment on these claims (ECF No. 87).[3] Sterling has also separately moved to preclude Wade from introducing the testimony of his designated expert witness, Dr. Sorhab Zahedi. (ECF No. 80.) For the reasons that follow, I GRANT Sterling's motion for summary judgment and DENY the motion *in limine* as moot.

## I.  Factual Background

The facts set forth below are taken from the parties' Local Rule 56(a) statements and supporting exhibits and are undisputed unless otherwise indicated.

A week before March 18, 2017, a man came into the Kay Jewelers store in the Buckland Hills Mall ("the Mall"), gave the staff multiple different names, and on two separate occasions attempted to use multiple credit cards that were all declined. (ECF No. 88, Sterling's Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") ¶ 4; ECF No. 93-1, Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") ¶ 4.) The parties dispute whether the Sterling employees on duty, Jamileth Anes and Carmen Santos, suspected the man of criminal activity, such as credit card fraud. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 5; Pl.'s L.R. 56(a)2 Stmt. ¶ 7.)[4] The parties also dispute whether this man was ultimately arrested at a different Kay Jewelers store. (Def.'s L.R. 56(a)1 Stmt. ¶ 100; Pl.'s L.R. 56(a)2 Stmt. ¶ 100.)

On March 18, 2017, Wade visited the Mall. (Def.'s L.R. 56(a)1 Stmt. ¶ 1; Pl.'s L.R. 56(a)2 Stmt. ¶ 1.) Wade passed back and forth in front of the Kay Jewelers store four or five times. (Def.'s

---

[3] I address GGP's and PSC's motions for summary judgment (ECF Nos. 95, 97) in a separate ruling.

[4] The parties identify this and other facts as disputed, but in not all of these instances did the parties submit evidence that raises a genuine dispute, and in some instances plaintiff's denials are not supported by the evidence cited in his Local Rule 56(a)2 statement. I nonetheless identify the facts as disputed here, and discuss below whether particular facts are genuinely disputed.

L.R. 56(a)1 Stmt. ¶ 12; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 11–12.) Santos and Anes were the only employees working at the Kay Jewelers store at the time of the incident. (Def.'s L.R. 56(a)1 Stmt. ¶ 6; Pl.'s L.R. 56(a)2 Stmt. ¶ 6.) Anes saw Wade outside of the Kay Jewelers store. (Def.'s L.R. 56(a)1 Stmt. ¶ 7; Pl.'s L.R. 56(a)2 Stmt. ¶ 7.) The parties dispute whether Anes honestly mistook Wade for the individual from the week before, whether Wade bore a resemblance to that individual, and whether Wade was staring into the Kay Jewelers store. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 7–11, 13; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 7–11, 13.) According to Sterling, Anes reported to Santos that she saw the person who attempted credit card fraud the week before in front of the store. (Def.'s L.R. 56(a)1 Stmt. ¶ 14; Pl.'s L.R. 56(a)2 Stmt. ¶ 14.)

As a result, Santos called mall security. (Def.'s L.R. 56(a)1 Stmt. ¶ 16–17; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 16–17.) The parties dispute what Santos told mall security on the call. According to Sterling, Santos told mall security that a Sterling employee believed she saw a person who had attempted credit card fraud at the store the prior week and asked them to "stand by" in the vicinity of the store in case the person attempted any type of crime. (Def.'s L.R. 56(a)1 Stmt. ¶ 18.) Sterling proffers that the shared understanding of a "stand by" request is be somewhere nearby and observe the store; mall security does not normally respond to a request to "stand by" by entering the store or interacting with any store patrons. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 20–22.) According to Wade, Santos did not ask mall security to "stand by," but instead reported to mall security that Wade may try to do a "grab-and-run" and later to police that Wade was suspected of a crime. (Pl.'s L.R. 56(a)2 Stmt. ¶ 18.) The parties also dispute whether the Sterling employees identified Wade by name to mall security or anyone else; it is undisputed that they did not know Wade's name. (Def.'s L.R. 56(a)1 Stmt. ¶ 19; Pl.'s L.R. 56(a)2 Stmt. ¶ 19.)

After Santos called, two mall security officers, Matthew Vieweg and Shevada Davis, came to the Kay Jewelers store and spoke with Santos. (Def.'s L.R. 56(a)1 Stmt. ¶ 23; Pl.'s L.R. 56(a)2 Stmt. ¶ 23.) Santos was the only Sterling employee who spoke with mall security. (Def.'s L.R. 56(a)1 Stmt. ¶ 24; Pl.'s L.R. 56(a)2 Stmt. ¶ 24.) The parties dispute whether Santos told Vieweg and Davis during the conversation to stand by or whether she told them to look for Wade. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 23, 26; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 23, 26.) The parties also dispute whether Santos (or any other Sterling employee) asked mall security to call the police, detain Wade, initiate any type of criminal proceeding against Wade, or engage Wade in any way. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 26–30; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 26–30.) The parties further dispute whether mall security decided what action to take and whether Sterling employees have authority to direct the actions of mall security. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 31–32; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 31–32.)

Mall security called the Manchester Police. (Def.'s L.R. 56(a)1 Stmt. ¶ 33; Pl.'s L.R. 56(a)2 Stmt. ¶ 33.) The parties dispute, among other things, whether Santos expected mall security to call the police or knew that they would, based on either her knowledge at the time or her past practice. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 35–46; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 35–46.) Mall security told the police that a Kay Jewelers employee reported seeing a person she believed was the suspect in a previously attempted fraud at the Kay Jewelers store. (Def.'s L.R. 56(a)1 Stmt. ¶ 47; Pl.'s L.R. 56(a)2 Stmt. ¶ 47.)

Officer John Decker was the only police officer present in the Mall that day. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 48–49; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 48–49.) The parties dispute whether Officer Decker first went into Kay Jewelers and talked to a Sterling employee before finding Wade. (*See* Pl.'s L.R. 56(a)2 Stmt. ¶ 18.) The parties further dispute whether, once he found Wade, Officer Decker approached Wade or affirmatively stopped him. (Def.'s L.R. 56(a)1 Stmt. ¶ 49; Pl.'s L.R.

56(a)2 Stmt. ¶ 49.)  Officer Decker asked for Wade's ID card (*i.e.*, his driver's license), which Wade provided.  (*Id.*)  The parties dispute whether Officer Decker's request for Wade's ID was voluntary, whether Wade voluntarily provided his ID, and whether Wade demanded or instructed Decker to return his ID at any point.  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 50–53; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 50–53.)  Officer Decker asked Wade to walk with him to the Kay Jewelers store, but Wade initially declined.  (Def.'s L.R. 56(a)1 Stmt. ¶ 54; Pl.'s L.R. 56(a)2 Stmt. ¶ 54 (relying on Wade's testimony that Wade "declined at first").)  Wade then began walking with Officer Decker, but the parties dispute whether this was voluntary too.  (*Id.*)  While Wade was with Officer Decker, Wade called his lawyer, and nobody made any attempt to prevent Wade from calling his lawyer.  (Def.'s L.R. 56(a)1 Stmt. ¶ 57; Pl.'s L.R. 56(a)2 Stmt. ¶ 57.)

The parties dispute whether Officer Decker brought Wade's driver's license into the Kay Jewelers store to show the Sterling employees, as well as the content of any conversation between Officer Decker and the employees.  (Pl.'s L.R. 56(a)2 Stmt. ¶ 55; *see* ECF No. 100 at 10–11 (conceding factual dispute on whether Decker went into Kay Jewelers after his conversation with Wade ended).)  Wade never went into the Kay Jewelers store or interacted with any Sterling employees.  (Def.'s L.R. 56(a)1 Stmt. ¶ 114; Pl.'s L.R. 56(a)2 Stmt. ¶ 114.)  The parties dispute whether there was any interaction between the police and the Sterling employees, or whether any Sterling employee asked the police to detain or engage with Wade in any way.  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 115–17; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 115–17.)  When the Sterling employees realized that Wade was not the same person from the week before, they so informed Officer Decker.  (Def.'s L.R. 56(a)1 Stmt. ¶ 55; Pl.'s L.R. 56(a)2 Stmt. ¶ 55.)  Once he learned that Wade was not the suspect from the week before, Officer Decker thanked Wade for his time and ended their conversation.  (Def.'s L.R. 56(a)1 Stmt. ¶ 56; Pl.'s L.R. 56(a)2 Stmt. ¶ 56.)

The parties dispute whether Wade's interaction with Officer Decker was voluntary, whether Wade was detained against his will, whether Officer Decker or anyone else told Wade that he could not leave, or whether Wade asked if he was free to leave. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 58–62; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 58–62.) It is undisputed, however, that Officer Decker never placed Wade under arrest, never handcuffed Wade, and never directly physically touched Wade. (*See* Def.'s L.R. 56(a)1 Stmt. ¶¶ 63–65; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 63–65.) Although the parties dispute exactly how long the incident lasted, Wade admits that it lasted less than 20 minutes in total. (Def.'s L.R. 56(a)1 Stmt. ¶ 118; Pl.'s L.R. 56(a)2 Stmt. ¶ 118 ("The Incident started just before security at Buckland Hills mall received the telephone call from Santos at 12:13 P.M. on March 18, 2017. . . The incident ended just a minute or two before 12:33 P.M.").)

## II.     Legal Standard

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "A fact is material when it might affect the outcome of the suit under governing law," and a dispute of fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . ., and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (internal citations omitted).

If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). It "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citations omitted). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks and citations omitted).

## III. Discussion

Sterling moves for summary judgment on all claims against it arising out its employees' role in the March 18, 2017 incident. (ECF No. 87.) As earlier discussed, only four claims remain against Sterling: (1) false imprisonment; (2) defamation *per se*; (3) negligent infliction of emotional distress; (4) and negligent supervision. Because Wade has failed to raise a genuine dispute of material fact as to each claim, I conclude that Sterling is entitled to summary judgment. I address each claim in turn.

### A. False Imprisonment

Wade argues that disputed issues of material fact preclude summary judgment on his false imprisonment claim against Sterling. (ECF No. 93 at 24–34.) But he has failed to submit any evidence suggesting that Sterling's employees acted with the requisite intent to confine Wade; and because he has the burden to prove that they did, his claim fails.

"[F]alse imprisonment is the unlawful restraint by one person of the physical liberty of another." *Berry v. Loiseau*, 223 Conn. 786, 820 (1992) (citation omitted). "To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the

defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Id.* (citation omitted). The restraint must be accomplished through the "exercise of force . . . express or implied." *Id.* at 821. "Any period of such restraint, however brief in duration, is sufficient to constitute a basis for liability." *Green v. Donroe*, 186 Conn. 265, 267 (1982); *see id.* ("The fact that there was no formal arrest of the plaintiff . . . and that he remained in the custody of the police for only ten minutes would not necessarily defeat his cause of action for false imprisonment."). Nonetheless, "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Rivera v. Double A Transp., Inc.*, 248 Conn. 21, 31 (1999) (citing *Donroe*, 186 Conn. at 268). "Nothing less than a rather extreme brand of recklessness will substitute for the standard requirement of intention in false imprisonment cases." *Id.*

Wade argues that Santos and Anes, by reporting Wade to mall security and speaking with Officer Decker, acted with the purpose of imposing a confinement on Wade or with knowledge that his confinement would result with substantial certainty. (ECF No. 93 at 29–34.) But even when all ambiguities in the record are resolved and all reasonable inferences from the evidence drawn in Wade's favor, there is no evidence from which a reasonable juror could find that Santos or Anes acted with the requisite intent.

The undisputed facts, when construed in the light most favorable to Wade, show as follows. Santos called mall security and told them that a Kay Jewelers employee believed she saw a person near the store who had attempted to commit credit card fraud at the store the prior week and that security should "stand by" the store in case the man attempted a crime. (*See* Def.'s L.R. 56(a)1 Stmt. ¶¶ 16, 18; Pl.'s L.R. 56(a)2 Stmt. ¶ 16; ECF No. 87-4, Santos Dep. Tr. 33:12-16, 39:23-

40:22, 48:3-7, 76:4-9.)  By "stand by," she meant that mall security should stay somewhere near the store and observe the store.  (Def.'s L.R. 56(a)1 Stmt. ¶ 21; *see* ECF No. 87-4, Santos Dep. Tr. 81:16-82:12.)  Both Santos and Anes believed that mall security typically responds to calls to stand by from Kay Jewelers by "walking around in the general area outside of the store," not "by coming inside the store or interacting with any patron of Kay Jewelers or the Mall."  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 20, 22 (citing ECF No. 87-4, Santos Dep. Tr. 13:21-14:2, 36:18-22, 81:16-82:12; ECF No. 87-5, Anes Dep. Tr. 20:23-21:7).)  No other Sterling employee called mall security about Wade.  (Def.'s L.R. 56(a)1 Stmt. ¶ 17; Pl.'s L.R. 56(a)2 Stmt. ¶ 17.)

Two mall security guards came to the Kay Jewelers store in response to the call and talked to Santos, who again told them to stand by.  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 23–24; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 23–24; *see* ECF No. 87-4, Santos Dep. Tr. 41:11-12 ("I told them the same thing: just stand by, you know.").)  Mall security left after talking to Santos.  (Def.'s L.R. 56(a)1 Stmt. ¶ 25; Pl.'s L.R. 56(a)2 Stmt. ¶ 25.)  Santos did not ask mall security to look for Wade.  (Def.'s L.R. 56(a)1 Stmt. ¶ 26; *see* ECF No. 87-4, Santos Dep. Tr. 42:1-2.)  No Sterling employee asked mall security to call the police, detain Wade, initiate any type of criminal proceeding against Wade, or engage Wade in any way.  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 27–30; *see* ECF No. 87-4, Santos Dep. Tr. 83:22–84:12; ECF No. 87-5, Anes Dep. Tr. 20:3-10.)  Mall security did not tell Santos they would call the police or that they intended to look for Wade, and Santos did not hear mall security say that they would call the police or expect they would do so.  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 35–38, 44; *see* ECF No. 87-4, Santos Dep. Tr. 44:16-23, 51:7-9, 53:18-55:12, 83:19-21, 85:16-20.)  In response to Santos' previous calls to ask mall security to "stand by," mall security had never called the police, interacted with the person, or detained the person.  (Def.'s L.R. 56(a)1 Stmt. ¶ 45; *see* ECF No. 87-4, Santos Dep. Tr. 82:13-83:2.)  Mall security has never responded to Santos' calls

by calling the police unless the person about whom security was called had already committed a crime. (Def.'s L.R. 56(a)1 Stmt. ¶ 46; *see* ECF No. 87-4, Santos Dep. Tr. 51:10-23.) Anes also did not know that mall security called the police and did not believe that mall security would respond to the call by calling the police, detaining Wade, or engaging Wade in any way. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 39–43; ECF No. 87-5, Anes Dep. Tr. 20:23-22:14.)

After Santos called them, mall security decided what action to take. (Def.'s L.R. 56(a)1 Stmt. ¶ 31; *see* ECF No. 87-4, Santos Dep. Tr. 85:7–85:15.) Sterling does not have the authority to direct the actions of mall security. (Def.'s L.R. 56(a)1 Stmt. ¶ 32; *see* ECF No. 87-4, Santos Dep. Tr. 85:7–85:15.) Mall security, and not an employee of Sterling, called the police. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 33–34; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 33–34.) When Officer Decker arrived, no Sterling employee asked the police to detain Wade or to engage with Wade in any way. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 116–117; ECF No. 87-4, Santos Dep. Tr. 84:22-85:6; ECF No. 87-5, Anes Dep. Tr. 20:14-19.)

Wade purports to raise numerous disputes about this narrative, but none amount to a genuine dispute of material fact. *See McCarthy*, 482 F.3d at 202 (A dispute of fact "is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). First, Wade disputes the content of Santos' call to mall security. Specifically, he disputes that Santos told mall security on the call that a Kay Jewelers employee believed she saw a person near the store who had attempted to commit credit card fraud at the store the prior week and that security should "stand by" the store in case the man attempted a crime. (Def.'s L.R. 56(a)1 Stmt. ¶ 18 (citing ECF No. 87-4, Santos Dep. Tr. 33:12-16, 39:23-40:22, 48:3-7, 76:4-9); Pl.'s L.R. 56(a)2 Stmt. ¶ 18.) Wade argues that evidence in the record shows "[c]learly Santos reported to police that Plaintiff was a suspect of a crime", which is not

actually in dispute, but also that "she did not say stand by, do nothing." (Pl.'s L.R. 56(a)2 Stmt. ¶ 18.) But none of the evidence Wade cites raises a genuine dispute on whether Santos asked mall security to stand by. The cited deposition testimony of Ms. Santos confirms that she did make that request. (*See* ECF No. 87-4, Santos Dep. Tr. 40:2-9 ("I told [mall security when she called] there is a gentleman. He is no longer in front of our store. He was here about a week ago. And we just want you to stand by just in case he tries to do a grab-and-run. He had been there before with the credit cards, so please just stand by just in case. You know, just kind of like if in case he tries to do a grab-and-run.").) The cited deposition testimony of Officer Decker relates to his telling Wade that a Kay employee had identified him as a suspect. (ECF No. 87-3, Decker Dep. Tr. 78:6-15.) The cited deposition testimony of security guards Vieweg and Davis recounts that Officer Decker went into Kay's to confirm the situation. (ECF No. 87-6, Davis Dep. Tr. 56:4-17; ECF No. 87-7, Vieweg Dep. Tr. 54:6–57:12.) Davis's testimony that ". . . anything like that we are automatically supposed to call the police, because we are not supposed to deal with [it]" does not raise a genuine dispute over what Santos said on the call to mall security. (ECF No. 87-6, Davis. Dep. Tr. 15:1-2.) It also does not raise a genuine dispute over whether Santos or Anes intended to confine Wade or were substantially certain that the call would result in his confinement, because Davis' understanding of the practice of mall security is not probative of Santos' or Anes' intent. Further, there is no evidence that Santos or Anes was aware of mall security's "automatic" practice. In any event, the act of calling the police, on its own, does not give rise to a reasonable inference that the caller knows with "substantial certainty" that an individual will be arrested or detained. *See Edelman v. Page*, No. 3:00-CV-01166 JAM, 2015 WL 1395893, at *11 (D. Conn. Mar. 25, 2015) (granting summary judgment to defendant who made an allegedly false report to the police resulting in plaintiff's arrest: "knowledge that an unlawful arrest is 'likely' is not nearly enough;

in order to be liable for false arrest, [the defendant] must have acted with knowledge that that the false arrest would, 'to a substantial certainty,' result from his report."), *aff'd sub nom. Edelman v. Schultz*, 683 F. App'x 60 (2d Cir. 2017); *see also Outlaw v. City of Meriden*, 43 Conn. App. 387, 392 (1996) ("Although the plaintiff pleaded a count alleging false arrest and a count sounding in false imprisonment, the applicable law for these two causes of action is identical.").

Second, Wade denies that mall security and Sterling both understood the term "stand by" to mean to stay near the store and observe, and that mall security typically responds to calls to "stand by" from Kay Jewelers by "walking around in the general area outside of the store," not "by coming inside the store or interacting with any patron of Kay Jewelers or the Mall." (Def.'s L.R. 56(a)1 Stmt. ¶¶ 20–22 (citing ECF No. 87-4, Santos Dep. Tr. 13:21-14:2, 36:18-22, 81:16-82:12; ECF No. 87-5, Anes Dep. Tr. 20:23-21:7); Pl.'s L.R. 56(a)2 Stmt. ¶¶ 20–22.) However, Wade's denials cross-reference the same pieces of evidence discussed above, none of which speaks to what typically happens during a "stand by." (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 20–22 (citing *id.* ¶ 18).) Thus, Wade fails to create a genuine dispute of fact on these points too.

Third, Wade denies that Santos told mall security to "stand by" again when they arrived at Kay Jewelers to interview her. Wade's denial relies on the same evidence as his dispute over the content of Santos' initial call, but none of it contravenes Santos' testimony about what she told mall security. (Pl.'s L.R. 56(a)2 Stmt. ¶ 23 (citing *id.* ¶ 18); *see* ECF No. 87-4, Santos Dep. Tr. 41:11-12 ("I told them the same thing: just stand by, you know.").)

Fourth, Wade denies that Santos did not ask mall security to look for Wade or to call the police, arguing that she did not ask them *not* to look for him even though she knew they would. (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 26–27.) Wade does not raise a genuine dispute on these issues. The testimony Wade cites at best shows that Santos provided information that allowed mall security or

the police to identify Wade. (ECF No. 87-1, Wade (May 2017) Dep. Tr. 46:8-12 (reporting that Davis told him "Kay Jewelry called and said [Wade has been scamming them] for three months."), 70:8-11 ("[Davis] just start telling me that Kay Jewelry, the employee down there had called and made a report that me, it's me, the male, me, I am the one who had been scamming them for months"); ECF No. 87-7, Vieweg Dep. Tr. 55:15–58:25 (testifying that a Sterling employee talked to Officer Decker and Davis, but not discussing the content of the conversation).)[5] Wade's assertion that Santos and Anes did not ask mall security <u>not</u> to look for Wade does not contravene Santos's testimony that she never asked them to do so. The assertion is also immaterial: The issue is whether Santos and Anes intended that Wade be confined, not whether they took steps to prevent his confinement. *See Edelman*, 2015 WL 1395893, at *11 ("[K]nowledge that an unlawful arrest is 'likely' is not nearly enough; in order to be liable for false arrest, [the defendant] must have acted with knowledge that that the false arrest would, 'to a substantial certainty,' result from his report."). Likewise, Davis' testimony that mall security personnel were "automatically supposed to call the police" does not negate that Santos and Anes never asked them to. (Pl.'s L.R. 56(a)2 Stmt. ¶ 27 (citing ECF No. 87-6, Davis. Dep. Tr. 15:1-2 ("[A]nything like that we are automatically supposed to call the police, because we are not supposed to deal with -- we are not supposed to stop anyone. So we don't do that.")).)

Fifth, Wade denies that the Sterling employees lacked authority to direct the actions of mall security, because, according to Wade, they had authority "to not report to mall security that Wade was a criminal suspect." (Pl.'s L.R. 56(a)2 Stmt. ¶ 32.) Wade again cites Davis' testimony that

---

[5] The other evidence Wade cites in his opposition brief (ECF No. 93 at 30) also confirms that Santos simply identified Wade to dispatch and then to Davis and Vieweg once they arrived at the store. (ECF No. 87-6, Davis Dep. Tr. 11:15-16, 20:15-17, 43:25–44:11, 45:17-46:3; ECF No. 87-7, Vieweg Dep. Tr. 52:8–53:5.)

mall security were "automatically supposed to call the police" in this situation, but this does not address whether the Sterling employees had the authority to direct mall security's actions. (Pl.'s L.R. 56(a)2 Stmt. ¶ 32 (citing ECF No. 87-6, Davis. Dep. Tr. 15:1-2); *id.* (citing *id.* ¶¶ 18, 26, which I have already addressed).) Wade does not raise a genuine dispute as to Sterling's authority.

Sixth and finally, Wade disputes whether the Sterling employees had any interaction with Officer Decker. (*See, e.g.*, Pl.'s L.R. 56(a)2 Stmt. ¶¶ 34, 46.) Wade does raise a genuine dispute over whether the Sterling employees interacted with Officer Decker, but this dispute is not material because the evidence does not suggest that Santos and Anes told Officer Decker what to do. (*See, e.g.*, Pl.'s L.R. 56(a)2 Stmt. ¶¶ 34, 46; ECF No. 100 at 9 (conceding a dispute on this point).) The testimony Wade cites indicates that Officer Decker entered Kay's to talk to Davis and Santos before stopping Wade. (ECF No. 87-7, Vieweg Dep. Tr. 55:7–10 ("[Q.] [A]fter speaking with you, [Decker] spoke to Shevada and the Kay employee? A. Correct, he did."); ECF No. 87-6, Davis Dep. Tr. 56:6-7 ("[Decker] went into Kay Jewelers so he knew the situation."); *see also id.* Tr. 64:17-21.) There is also evidence that, after he stopped Wade, Officer Decker returned to Kay Jewelers and showed Wade's ID to both Anes and Santos, who confirmed that Wade was not the suspect. (ECF No. 87-5, Anes Dep. Tr. 34:24–35:1 (Anes talked to the police officer "when . . . he came to show me the driver's license."); ECF No. 87-4, Santos Dep. Tr. 42:13-16, 43:1-15, 84:18-21 ("Q. You said that the police officer after he had spoken with the person in the mall came in and spoke with you. A. Yes.").) However, there is no evidence about what was said between Officer Decker and Santos when Decker, according to Vieweg and Davis, first went into the store. (*See* ECF No. 87-3, Decker Dep. Tr. 15:4-9, 18:1-20:3, 23:10-23, 71:13-16, 112:8-13 (denying any interaction with Sterling employees before or after talking with Wade); ECF No. 87-4, Santos Dep. Tr. 44:7–44:9, 44:24-45:1 (denying that Officer Decker came to Kay Jewelers

before he arrived with the license); ECF No. 87-7, Vieweg Dep. Tr. 16:12-21 (denying personal

knowledge of Officer Decker's conversation with Sterling employees); ECF No. 87-6, Davis Dep.

Tr. 68:17-18 ("I don't know what was said. I don't know. I wasn't in the store when [Officer

Decker and the Sterling employees] were talking."). At best, the he "knew the situation" testimony

from Davis, ECF No. 87-6, Davis Dep. Tr. 56:6-7, suggests that Santos identified Wade as the

suspect from the previous week, although it is not clear how Davis would have personal knowledge

of what Decker knew since she was not present when Decker first entered Kay's. *Id.* In any event,

a reasonable juror could not infer from this evidence that Santos told Decker to detain, arrest, or

even search for Wade. Further, the second time Decker came into the store – with Wade's driver's

license – Wade was, even by his own account, already detained, as a result of the fact that Decker

had not yet returned his driver's license. In any event, the evidence concerning this second visit

was simply that the Sterling employees told Decker that Wade was <u>not</u> the suspect from the

previous week – which plainly does not suggest that they sought to confine him. (ECF No. 87-4,

Santos Dep. Tr. 42:13-16, 43:1-15 (testifying that her interaction with Officer Decker consisted of

Officer Decker "br[inging] [Santos] [Wade's] license" into Kay Jewelers and "ask[ing] me: Is this

the same gentleman [as the previous week]? And I said no. So the officer: Okay, thank you."),

45:2-10; ECF No. 87-5, Anes Dep. Tr. 34:18–35:7 (testifying that she did not recall the substance

of any conversation with Officer Decker.).) Accordingly, any dispute over whether Santos and

Anes interacted with Officer Decker is not material, because the parties point to no evidence from

which a reasonable juror could conclude that they acted with intent to confine Wade or acted with

"substantial certainty" that his confinement would result. *See Bryans v. Cossette*, No. 3:11-CV-

01263 JCH, 2013 WL 4737310, at *13 n.12 (D. Conn. Sept. 3, 2013) (determining that video

where nurse was pointing to police officers would not allow a reasonable jury to determine that nurse was telling the officers to seize plaintiff for purposes of a false arrest claim).

This case is similar to *Bryans v. Cossette*, 2013 WL 4737310, where Judge Hall granted summary judgment to a hospital on a false imprisonment claim. *Id.* at *14. In that case, police officers overheard two hospital employees' discussion about the plaintiff over an "open mic" and asked if they needed assistance. *Id.* at *13. The supervising hospital employee, who had already contacted hospital security, told the police that he would ask them to assist security if needed. *Id.* at *2–3, 13. The police nonetheless intercepted and arrested the patient before hospital security could reach him. *Id.* at *4. Judge Hall concluded that "no reasonable jury could determine that [plaintiff was detained] at the direction of, because of, or [with] the intention of [the hospital]," because the undisputed evidence showed that the hospital supervisor never asked the police officers to stop or arrest the plaintiff. *Id.* at *13–14. The same key facts are undisputed here: no Sterling employee asked either mall security *or* Officer Decker to stop or arrest Wade. The mere fact that there is a dispute over whether Sterling employees had a conversation with police to identify the plaintiff is not enough to create a genuine dispute on whether they intended to confine or knew that Wade's confinement would result with substantial certainty. *Id.* at *13.

Wade's remaining arguments are unpersuasive. He argues that that the Sterling employees intended to confine Wade because they "directed his detainment and release" inasmuch as Officer Decker only released Wade with Santos' "authorization." (ECF No. 93 at 31–34.) Wade relies on testimony showing that Officer Decker talked to Santos, stopped Wade, and then returned his ID to him only after Santos told Officer Decker that Wade was not the suspect. (*Id.* (citing, *inter alia*, ECF No. 87-3, Decker Dep. Tr. 78:14-15 ("I asked [Wade] to accompany me back towards Kay's so the employee could get a look at him"); ECF No. 87-4, Santos Dep. Tr. 42:14-16 ("[A]n officer

comes in the store and he says, hey, I need to speak with one of me"), 43:1-15 (Santos testifying

that she looked at Wade's license), 45:2-10 (Santos confirmed "no, that's not him," and "[Decker]

said okay. And he took the license. And I saw him walk over and basically apologize to the

gentleman. And he said: You're all set."), 57:3-5 (same); ECF No. 87-5, Anes Dep. Tr. 34:24–

35:1 (Anes talked to the police officer "when . . . he came to show me the driver's license.")). But

even construed in Wade's favor, this evidence shows that the ultimate determination of whether to

stop or release Wade lay with *Officer Decker*, not Santos, who was merely an eyewitness. *See*

*Edelman*, 2015 WL 1395893, at *11 ("[A]lthough [defendant] may have reported the alleged crime

in his official capacity, from that point onward, a police officer conducted the investigation, made

a probable cause determination, and decided to arrest plaintiff."). The conclusion Wade draws—

that the initial misidentification of Wade and later acknowledgement that he was not the suspect

of the previous week thrust the Sterling employees into the role of directing or authorizing Wade's

stop and release—is wishful thinking and does not raise a genuine dispute over whether Santos or

Anes intended to confine Wade.

Wade also seizes on a section of the "Sterling Jewelers' Store Security Manual Policy,"

asserting that it "instructed" Santos that, if she "desire[s] to report the facts of a shoplifting case,"

it is so "that a suspect may be transported and booked." (ECF No. 93 at 34; *see also* Pl.'s L.R.

56(a)2 Stmt. ¶ 46 (citing same).) The language Wade cites does not "instruct" Sterling employees

to do anything, but is simply one of several "suggestions for opening lines of communications"

with local police, in a section captioned "establishing and maintaining a good working relationship

with your local police agency." (ECF No. 93-4 at 11.) The specific provision Wade relies on states

that Sterling is "not going to use the police try to scare shoplifters; that when [they] call uniformed

officers to the store, it is because [they] desire to report the facts of a shoplifting case so that a

suspect may be transported and booked." (*Id.*)  It is unclear how this language fits the facts of this case, because, as noted, there is no evidence that a Sterling employee "call[ed] uniformed officers to the store." (*Id.*)  Even if it were relevant, however, the manual does not suggest that Kay employees are required have shoplifting suspects detained in all instances. (*See id.* at 3 ("[A] fundamental policy to remember is that we prefer every possible means be utilized to deter or prevent shoplifting as an alternative to apprehension or prosecution."), 10 ("[I]f you have any doubt in your mind about whether a person actually stole something, it is far better to take no action, except to keep the customer under observation.").)  Finally, Wade does not point to any evidence authenticating the manual or suggesting that it was binding on Santos or Anes during the applicable period.   For all these reasons, the manual raises no genuine issue of fact on whether Santos knew that Wade would be confined with substantial certainty as a result of her report to either mall security or Officer Decker.

In sum, because the undisputed evidence shows that neither Santos or Anes acted with the requisite intent to confine Wade, Sterling's motion for summary judgment on Wade's false imprisonment claim is granted.

### B.    Defamation *Per Se*

I also agree with Sterling that summary judgment should be granted on Wade's claim for defamation *per se*.  "To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627 (2009).  "As a variation on the fourth element of reputational harm, [d]efamation is also actionable per se." *Gleason v. Smolinski*, 319 Conn. 394,

431 n.31 (2015) (internal quotation marks and citation omitted).  To be actionable *per se* under the modern view, the defamatory statement must allege "a chargeable offense which is punishable by imprisonment."  *Id.*  "In the case of a statement that is defamatory per se, injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need neither plead nor prove it."  *Id.*

Wade argues that (1) Sterling's employees published a defamatory statement about Wade to a third party and (2) he need not show negligence to succeed on his claim. (ECF No. 93 at 34–39.)  Because I disagree with the second assertion and find that no reasonable jury could conclude Sterling's employees were negligent, I grant summary judgment to Sterling on this claim.

Under Connecticut law, defamation claims involving private figures[6] require a showing of at least negligence.  *See Miles v. Perry*, 11 Conn. App. 584, 589 (1987) (recognizing that "if [the plaintiff] is a private individual, she need only prove, by a preponderance of the evidence, negligence in the failure to investigate the facts properly prior to publication") (collecting cases under Connecticut law); *see also Lizotte v. Welker*, 45 Conn. Supp. 217, 222 (1996) ("In Connecticut, a private individual 'need only prove, by a preponderance of the evidence, negligence in the failure to investigate the facts properly prior to publication.'") (quoting *Miles*, 11 Conn. App. at 589), *aff'd*, 244 Conn. 156 (1998); *Pugliese v. Grande*, No. CV085003753S, 2011 WL 1105811, at *3 (Conn. Super. Ct. Mar. 7, 2011) (same).

Wade's argument that defamation is a strict liability tort is based solely on the recitation of the elements of a common law defamation claim in *Gleason*, 319 Conn. at 430–431.  (ECF No. 93

---

[6] There are four categories of defamation claims: "(1) public person/public matter, (2) private person/public matter, (3) public person/private matter, and (4) private person/private matter."  *Gleason*, 319 Conn. at 431 (citation and quotation marks omitted).  The parties have not addressed in their briefs whether this case involves a "private person/public matter" or a "private person/private matter."  I assume for purposes of this motion that the latter category is involved, because the Connecticut Supreme Court has applied the "actual malice" standard to the former category, *Gleason*, 319 Conn. at 449, which imposes a higher bar on defamation plaintiffs.

at 38–39.) *Gleason* involved a matter of public concern, however, and applied the "actual malice" standard to determine if a new trial was warranted as a result of the lower court's failure to determine if plaintiff had proved the falsity of the relevant statements. *See Gleason*, 319 Conn. at 446–52 (concluding that plaintiff did not establish actual malice). Accordingly, *Gleason* did not address whether a showing of negligence is required on a defamation claim involving a private matter and private person. *See* note 6, *supra*. Wade has not cited any other cases indicating that defamation is a strict liability tort in Connecticut.[7]

No one suggests that Wade is anything other than a private figure. Accordingly, Wade must prove that the Sterling employees were negligent in making the supposedly defamatory statement about him. Wade characterizes the defamatory statement as the Sterling employees' identification of Wade as "a suspect who attempted to illegally use a credit card in their store last week and possibly id theft." (ECF No. 93 at 35; ECF No. 93-3 at 2 ("[Decker] was called by mall security because a mall was identified by an employee of Kay Jeweler's as a suspect who attempted to illegally use a credit card in their store last week and possibly id theft.").) No matter how the defamatory statement is characterized, however, the undisputed facts show that the Sterling employees' initial misidentification of Wade as the man from the previous week was simply an honest, but reasonable, mistake.

---

[7] Moreover, the First Amendment likely requires at least a negligence showing to recover on a defamation claim involving a private figure. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) ("[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."); *see also Bailey v. Corbett*, No. 3:11-CV-1553 JCH, 2013 WL 994466, at *3 (D. Conn. Mar. 13, 2013) ("Even where the plaintiff is a private person, however, the Supreme Court has held that states cannot impose liability for defamation without requiring some showing of fault."), *adhered to on reconsideration*, No. 3:11-CV-1553 JCH, 2013 WL 1914461 (D. Conn. May 8, 2013).

When the evidence is viewed in the light most favorable to Wade, it shows as follows. A week before the incident on March 18, 2017, a man came into the Kay Jewelers, gave the staff multiple different names, and attempted to use multiple different credit cards that were all declined. (Def.'s L.R. 56(a)1 Stmt. ¶ 4; Pl.'s L.R. 56(a)2 Stmt. ¶ 4.) The man later came into the store a second time and again attempted to use multiple credit cards that were all declined. (*Id.*) Based on this behavior, both Anes and Santos believed that the man was attempting to commit credit card fraud. (Def.'s L.R. 56(a)1 Stmt. ¶ 5; ECF No. 87-4, Santos Dep. Tr. 37:21-38:5, 79:15-80:16; ECF No. 87-5, Anes Dep. Tr. 15:21-17:13.)

When Anes saw Wade outside Kay Jewelers a week later, she mistook him for the person that attempted credit card fraud a week before because she thought the two men looked extremely similar. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 7–9; ECF No. 87-5, Anes Dep. Tr. 15:18-20, 17:14-18:7; *id.* Tr. 17:21-22 ("Same height, same – they both had braids. They were the same skin color."); *id.* Tr. 22:21-23:1.) In addition, Officer Decker later examined a booking photo of a man arrested at a Kay Jewelers store in Holyoke, Massachusetts, and subsequently brought that photo to show Santos, who said, "I think this is the guy," meaning the suspect from the week before Wade's incident at the mall. (ECF No. 87-3, Decker Dep. Tr. 26:10-29:20; *see* Def.'s L.R. 56(a)1 Stmt. ¶ 100; ECF No. 87-3, Decker Dep. Ex. 1, at 33–45; *see also* ECF No. 87-4, Santos Dep. Tr. 46:2-23 (testifying that Officer Decker later informed her that the suspect was arrested).) Davis also later reviewed a photo of the same man received from a police officer. (ECF No. 87-6, Davis Dep. Tr. 16:21-25, 86:16-88:18.) Based on those photos, both Officer Decker and Davis testified that Wade looked extremely similar to the man from the previous week. (*See* Def.'s L.R. 56(a)1 Stmt. ¶ 10; ECF No. 87-3, Decker Dep. Tr. 27:6-29:1; *id.* Tr. 28:11-13 ("[Q.] [. . .] [W]as their physical appearance very similar? A. Yes."); ECF No. 87-6, Davis Dep. Tr. 16:21-17:19; *id.* Tr. 17:9, 17-

19 ("Very similar. Like identical…They just looked identical. Not even race. Like you put the two pictures together and you would think they were identical."), *id.* Tr. 88:19-23 ("And they looked exactly alike. Like no question. Not because he is black. Because they had braids, everything was the same. Like you would literally think they were identical, like.")). It was based on Anes' belief that Wade was that man that she told Santos that she saw the person from the week before in front of the store. (Def.'s L.R. 56(a)1 Stmt. ¶ 14; ECF No. 87-4, Santos Dep. Tr. 32:16-33:16; *id.* Tr. 36:10-15 ("[Anes] thought that was the same gentleman that had been in our store prior. So she saw him and kind of got a little freaked out, you know, like maybe we should just call security just in case. And I said okay.").) Even Wade repeatedly testified that he believed that the Sterling employees honestly mistook him for someone else. (*See* ECF No. 87-1, Wade (May 2017) Dep. Tr. 33:21-34:11, 39:21-40:7, 68:8-10 ("Q. You think [the Sterling employees] honestly thought you did something wrong? A. Yes."); ECF No. 87-2, Wade (May 2018) Dep. Tr. 33:22-34:4 ("Q. [. . .] You believe that [the Sterling] employees honestly mistook you for the person that committed a crime; is that correct? A. Yes.").) The evidence cited above suggests that Anes' misidentification of Wade as the suspect in a previous credit card fraud, while mistaken, was both in good faith and reasonable based on the undisputed evidence from multiple witnesses that the two men looked extremely similar.

Wade has done <u>nothing</u> to rebut or cast doubt on the reasonableness or diligence of Anes' identification of Wade as the suspect from the previous week. Indeed, his brief in opposition to summary judgment provides no analysis on the negligence issue, because, as noted, he takes the position that he need not prove negligence. (ECF No. 93 at 39.) Because Sterling's brief presents argument that it is entitled to summary judgment because its employee was not negligent (ECF No. 89 at 33), Wade's failure to respond on this point is alone a sufficient basis to grant Sterling

22

summary judgment on the issue. *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *see also Xixiang Yang v. Zhiyu Luo*, No. 17 CIV. 2577, 2018 WL 1363498, at *6 (S.D.N.Y. Feb. 23, 2018) ("[T]he Court is under no obligation to review this record in search of a material fact sufficient to deny summary judgment.").

In addition, even after considering the denials Wade offers and evidence he cites on other issues in the case, I find that he fails to raise a single genuine dispute of fact as to negligence. His Local Rule 56(a)2 Statement denies that Sterling employees thought the man from the previous week was attempting to commit credit card fraud, asserting that Santos testified that the "man was not deemed suspicious" and "did not suspect [him] of any criminal activity." (Pl.'s L.R. 56(a)2 Stmt. ¶ 5 (citing ECF No. 84-5, Santos Dep. Tr. 33:17-35:19, 36:25-38:5).) But the testimony Wade cites shows that, after the man left the store the first time, Santos felt uncomfortable:

> So he tries it again. I don't remember this time if it was a different credit card or not, but he tried it again about three times and declined all three times. So at this point, he is like: You know what? I'll be back another time. That's fine. And at that point he left. And **I kind of felt uncomfortable** because I felt like, you know, it happens a lot, especially in the jewelry business. And I'd been in the business forever, you know, with Lids, and **I see a lot of fraud**.

(ECF No. 84-5, Santos Dep. Tr. 35:14-23 (emphasis added).) And Santos's testimony further states that while she did not *confirm* the cards used were fraudulent, she suspected that they were:

> Q. [T]he week before that when the gentleman was using the various cards that failed, did you confirm those credit cards were –
>
> A. No, I didn't confirm it. It was just a feeling. It wasn't like I was, you know, accusing him of anything. I was just like taking precautions based on what I had seen.
>
> Q. The week before that when those credit cards didn't go through or failed several times, you didn't think those credit cards were fraudulent, did you?

[Objection]

A. **I felt the second time he came back.**  Not the first time because a lot of customers have credit[] cards that decline.  It's just the way it is.

Q.  So the second time he came back, you thought –

A. I had a feeling, yeah.  But I didn't call security or anything because nothing happened. So, you know, there was nothing that went through or . . . .

Q.  Why did you feel the second time he around when those cards failed that those cards were false cards?

A. Just because he had – because, again, it was several credit cards and it was just basically really through the name change.  Like at first he gave me one name and then the second name so I kind of was like okay, you know.  So that's really it.  That's why I got a feeling of it.  But nothing happened so I just kind of let it be in case he came back.

(ECF No. 84-5, Santos Dep. Tr. 36:25-38:5 (emphasis added).)  Accordingly, Wade fails to raise any genuine dispute over whether Sterling's employees suspected the man the previous week of credit card fraud.   Wade's attempt to dispute that Anes first thought Wade was the person who attempted credit card fraud the week before, which relies on the same testimony from Santos, does not raise a genuine dispute of fact for the same reason.  (Pl.'s L.R. 56(a)2 Stmt. ¶ 7 (citing ECF No. 84-5, Santos Dep. Tr. 33:17-35:19, 36:25-38:5).)  The same is true of Wade's denial that the suspect from the previous week was arrested in Holyoke, Mass. for credit card fraud.  (Pl.'s L.R. 56(a)2 Stmt. ¶ 100 (citing *id.* ¶¶ 4, 5, 7).)[8]

Wade also denies that Anes honestly mistook Wade for the person who attempted credit card fraud the previous week, that she mistook him because Wade looked extremely similar to that person, and that the two individuals do in fact look extremely similar.  (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 8–10.)  Wade has submitted no evidence rebutting the testimony of Anes, Decker, and Davis that

---

[8] In his denial, Wade also relies on "Santos['] and Anes['] . . . record of racial pro[filing] and misidentification of customers" (*id.* (citing ¶ 73)), but this does not raise a genuine dispute as to whether that suspect was ultimately arrested.  Nor does any of the evidence cited in support of the "record of racial profiling" assertion relate to Anes.

he looked very much like the man from the previous week. His argument on this point asserts only that "Anes testified 'they both had braids,'" but "[Wade] was wearing a do-rag that covered his head and hair." (Pl.'s L.R. 56(a)2 Stmt. ¶ 8.)[9] But Anes testified that her identification of the similarities was based on more than just Wade's hair. (*See* ECF No. 87-5, Anes Dep. Tr. 17:18-22 ("Same height, same -- they both had braids. They were the same skin color.").) Thus, even crediting Wade's testimony that he was wearing a do-rag that day (and thus by implication that Anes could not have seen his hair), he does not contravene any of the other similarities leading to Anes' reasonable belief that Wade and the individual from the previous week were the same person. Nor does Wade's testimony contravene the testimony of the two third-party witnesses who saw Wade—Officer Decker and Shevada Davis—and concluded that he resembled the man from the previous week based on a range of factors. (*See, e.g.*, ECF No. 87-3, Decker Dep. Tr. 28:16-18 ("The hair, the type of hair, the length of the hair, and the general complexion. The age was a little off."); ECF No. 87-6, Davis Dep. Tr. 17:15-19 ("They had the same braids . . . Same height. They just looked identical. Not even race. Like you put the two pictures together and would you think they were identical.").)[10] Accordingly, Wade fails to raise a genuine dispute about whether Anes honestly mistook Wade for the person who attempted credit card fraud the previous week, whether she mistook him because Wade looked extremely similar to that person, or whether the two individuals in fact look extremely similar.

---

[9] Wade also asserts that Santos did not see Wade's face, but this fact is not material because it is undisputed that *Anes*, not Santos, made the initial misidentification and told Santos, who in turn called mall security. (Pl.'s L.R. 56(a)2 Stmt. ¶ 8 (citing ECF No. 84-5, Santos. Dep. Tr. 33:9-11, 78:21-24); *see also* Pl.'s L.R. 56(a)2 Stmt. ¶¶ 7 ("Admit that [Anes] saw Plaintiff outside of Kay Jewelers store"), 14 ("Admit that Anes told Santos she saw Plaintiff in front of the store."), 16 (admitting that Santos called mall security).)

[10] Wade has sued neither Decker nor Davis. While Davis may have been one of the Jane Doe defendants Wade sought to sue (but failed to identify with diligence), there is nothing in the record suggesting he ever sought to sue Decker.

Although granting summary judgment is rare in a negligence case, it is nonetheless appropriate where the non-movant fails to put forward <u>any</u> evidence to rebut the movant's showing. *See King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997) ("[S]ummary judgment is highly unusual in a negligence action where the assessment of reasonableness generally is a factual question to be addressed by the jury . . . Summary judgment . . . is nonetheless appropriate when the non-moving party has failed to set forth any facts that go to an essential element of the claim.") (internal citations omitted). Wade has failed to do so here, and thus has not raised any dispute on whether Sterling's employees acted negligently. *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 126–27 (2d Cir. 2013) (affirming grant of summary judgment on defamation claim under Connecticut law due to plaintiff's failure to present any evidence of actual malice).

Because Wade has not shown any genuine dispute on whether the Sterling's employees acted negligently in identifying him and reporting him to mall security, I grant summary judgment to Sterling on Wade's defamation claim.

### C. Negligent Infliction of Emotional Distress

To prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). Thus, "[t]he plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or

bodily harm." *Davis v. Davis*, 112 Conn. App. 56, 68 (2009) (quoting *McNamara v. Tournament Players Club of Connecticut, Inc.*, 270 Conn. 179, 197 (2004)).

Wade argues that summary judgment is not appropriate because Sterling's conduct was "unreasonable," and because the evidence shows that this unreasonable conduct was the cause of Wade's emotional distress. (ECF No. 93 at 42.) I disagree, because Sterling's employees' conduct was not "unreasonable." The undisputed evidence discussed above shows they simply made a reasonable but mistaken identification of Wade to mall security, which they promptly corrected when given another opportunity to identify him. I thus conclude that there is no genuine dispute of material fact on whether the Sterling employees' conduct created an unreasonable risk of emotional distress. Accordingly, I grant summary judgment to Sterling on Wade's claim for negligent infliction of emotional distress.

### D.     Negligent Supervision

To recover on a negligent supervision claim under Connecticut law, "plaintiff must plead and prove that she suffered an injury due to the defendant's failure to supervise an employee whom the defendant had [a] duty to supervise." *Brooks v. Sweeney*, 299 Conn. 196, 209 n.12 (2010) (citing *Roberts v. Circuit–Wise, Inc.*, 142 F. Supp. 2d 211, 214 (D. Conn. 2001)). The injury on a negligent supervision claim must be an injury in tort. *See Deguzman v. Kramer*, No. 3-04-CV-2064 (JCH), 2005 WL 2030447, at *2 (D. Conn. Aug. 23, 2005) ("While no Connecticut case appears to spell out the elements of a claim for negligent supervision, it appears that such a claim must allege an injury in tort."); *Maggipinto v. Ulbrich Stainless Steels & Special Metals, Inc.*, No. CV166009606S, 2017 WL 2111405, at *2 (Conn. Super. Ct. Apr. 20, 2017) (recognizing same). Wade argues that summary judgment should not be granted on this claim because he alleges two underlying torts, defamation and false imprisonment, and because Sterling should have known of

the propensity of its employees to engage in such tortious conduct. (ECF No. 93 at 43–44.) Because I have granted summary judgment to Sterling on all tort claims based on its employees' conduct, I likewise grant summary judgment to Sterling on Wade's negligent supervision claim. *See Deguzman*, 2005 WL 2030447, at *2 (granting motion to dismiss on negligent supervision claim where no other tort claims were alleged).

**IV.    Sterling's Motion *in Limine***

Because I have granted summary judgment to Sterling on all claims, Sterling's motion *in limine* to preclude Wade from introducing the testimony of Dr. Sohrab Zahedi is DENIED as moot. (ECF No. 80.)

## V. Conclusion

For the foregoing reasons, Sterling's motion for summary judgment is GRANTED, and its motion *in limine* is DENIED as moot. (ECF Nos. 80, 87.) The Clerk is directed to enter judgment against Wade and in favor of Sterling. In addition, Wade's claims against the John and Jane Doe defendants are DISMISSED, and the Clerk is directed to terminate them from the case. The Court further notes that Sterling has filed a motion for attorney's fees in which it indicates that it may file an updated motion for fees with respect to plaintiff's non-federal claims at the conclusion of the action. (ECF No. 106 at 2–3.) Sterling is directed to file such any such motion within **21 days**. If Sterling fails to file any motion by the deadline, the Court will rule on the current motion. (ECF No. 106.)

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
              March 27, 2019