# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FABIAN WADE,

     Plaintiff,

     v.

KAY JEWELERS, INC., STERLING JEWELERS,
INC., GGP, INC., AND JANE & JOHN DOES, 1–5

     Defendants.

No. 3:17-cv-990 (MPS)

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This suit arises out of a March 18, 2017 incident at the Buckland Hills Mall in Manchester,

Connecticut, in which employees at a Kay Jewelers store misidentified Plaintiff Fabian Wade and

summoned mall security, which called the police. Wade was then briefly questioned by the police

before he was allowed to proceed on his way. Wade sued the owner of the Kay Jewelers store,

Defendant Sterling Jewelers, Inc. ("Sterling"), the owner of the Buckland Hills Mall, GGP, Inc.

("GGP"), and numerous Jane and John Does alleged to be security guards at the mall or employees

of the Kay Jewelers store. (ECF No. 36.) GGP in turn brought a third-party complaint against the

employer of the mall security personnel, Professional Security Consultants, Inc. ("PSC"). I

previously granted in part and denied in part the defendants' motions to dismiss. (ECF No. 105.)

As a result, Wade has three remaining claims against GGP, all under state law: (1) false

imprisonment; (2) negligent infliction of emotional distress; and (3) negligent supervision. (*Id.* at

29.) GGP in turn has two remaining claims against PSC for common law and contractual

indemnification. (*Id.*)

Both GGP and PSC now move for summary judgment. (ECF Nos. 95, 97.) GGP argues

that because PSC contracted with GGP to provide security services at the Buckland Hills Mall,

PSC is an independent contractor and thus GGP may not be held liable for any of Wade's claims,

which are based on acts by PSC's employees. (*See* ECF No. 97 at 1–2; ECF No. 97-1 at 12–18.) GGP further argues that even if it can be held liable for the torts of PSC's employees, it is nonetheless entitled to summary judgment on Wade's false imprisonment, negligent infliction of emotional distress, and negligent supervision claims against it. (ECF No. 97 at 2–3.) For the reasons that follow, I GRANT GGP's motion for summary judgment (ECF No. 97), and thus DENY PSC's motion for summary judgment as moot (ECF No. 95).[1]

## I.    Factual Background

The facts set forth below are taken from the parties' Local Rule 56(a) statements and supporting exhibits and are undisputed unless otherwise noted.

### A.    Relationship between GGP and PSC

GGP, the owner of the Buckland Hills Mall, contracted with PSC "to provide security services for the Buckland Hills Mall through a Security Agreement which specifically warranted that [PSC] was an independent contractor and that [PSC] employees were not employees of Shoppes at Buckland Hills or GGP." (ECF No. 97-11, GGP's Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") at ¶ 12; ECF No. 102-1, Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") at ¶ 12 (admitting same); *see* ECF No. 97-10, Exhibit A to Exhibit I, Security Agreement attached to Affidavit of Alfred K. Sherwood, at ¶¶ 3(E)(3), 9(G) (hereinafter "Sec. Agreement").) That agreement, dated May 29, 2015, is between the Shoppes at Buckland Hills, LLC and PSC, though a GGP-related entity agreed to represent the Shoppes at Buckland Hills, LLC in "all matters covered by th[e] agreement." (ECF No. 97-10 at 4; Sec. Agreement. ¶ 3(C).) For the purposes of this motion, I construe references to both the Shoppes at Buckland

---

[1] I address Sterling's motion for summary judgment (ECF No. 87) in a separate decision.

Hills, LLC and the GGP-related entity in the agreement as "GGP," as neither party contends the distinction matters.

GGP agreed to "engage[] [PSC] to provide security services in accordance with the terms of this Agreement." (Sec. Agreement. ¶ 3(A).) The Security Agreement provided details about PSC's management obligations in paragraph 3(D). Specifically, paragraph 3(D)(1) provides that PSC would establish a dedicated management team:

> Dedicated GGP Management Team. [PSC] shall establish a corporate management group dedicated to the [Buckland Hills Mall] and other properties owned by [GGP's] affiliates ("**Dedicated Team**"). The Dedicated Team shall be responsible for fulfillment of [GGP's] performance standards. The Dedicated Team shall be comprised of a VP/General Manager and/or Regional/Group Managers.

(Sec. Agreement ¶ 3(D)(1).) Paragraph 3(D)(2) provides for PSC managers' general oversight responsibilities and their permitted management hours:

> Program Oversight, Property Visits, Contacts. [PSC's] Regional/Group Managers are to be security practitioners responsible for the overall success of the on-site security program and the execution of all applicable requirements set forth in this Agreement. The Dedicated Team will make regular visits to the Property and regularly communicate with [GGP] property Manager ("**Property Manager**") and the GGP Corporate Security Director to solicit feedback. Unless otherwise approved in advance in writing by the GGP VP of Security, [PSC] will provide dedicated management groups solely servicing GGP malls, and each assigned regional manager shall manage no more than 8,000 hours of security [c]overage per week. Any regional manager exceeding 8,000 hours of security coverage per week will require a written exception from the GGP VP of Security.

(Sec. Agreement ¶ 3(D)(1).) Paragraph 3(D)(5) provides in relevant part for PSC's obligations to train its employees on GGP's CCTV system:

> CCTV System Knowledge. [PSC] will provide and maintain at its corporate office at least one dedicated CCTV master trainer for [GGP's] American Dynamics' CCTV systems. The master trainer will be responsible for overseeing the training program for Contractor's staff assigned to operate [GGP's] CCTV systems. . . .

(Sec. Agreement ¶ 3(D)(5).)

Paragraph 3(E) set requirements for PSC's "On-Site Personnel." (*Id.* ¶ 3(E).) In particular, paragraph 3(E)(1) provides in relevant part:

> Security Staff. [PSC] shall provide a stable staff that is trained and capable of providing the Services. Subject to the specific staffing requirements outlined in **Exhibit A**, [PSC] will provide an on-site security manager ("**Security Manager**"), assistant security manager, supervisors, CCTV operators/dispatchers, security officers, and police officers, as applicable. [. . .]

(Sec. Agreement. ¶ 3(E)(1).) Exhibit A is attached to the Security Agreement and is entitled "Property Staffing Agreement and Billing Rates." (ECF No. 97-10 at 27–28.) It contains an "[a]nnual [e]stimate" for security at the Buckland Hills Mall and includes tables of various security positions with "[w]age [r]ate[s]," "[b]ill rate[s]," "[w]eekly [h]ours," and "[a]nnual [c]ost." (ECF No. 97-10 at 27–28.)

In addition, Paragraph 3(E)(3) states explicitly that PSC's employees are not GGP's employees. (Sec. Agreement. ¶ 3(E)(3) ("[PSC's] employees are NOT employees of [GGP]. [PSC's] security staff shall be employees of [PSC] or, to the extent required by state or local laws or regulations, employees of any entity controlled by or under common control with [PSC].").) This provision also provides that in the usual course, "the [GGP] Property Manager, or his designees, will make reasonable attempts to communicate security related requests or assignments to the on-site [PSC] Security Manager or a designated security supervisor." (*Id.*) Nonetheless, "on occasion [such communications] may not be timely or practicable and requests may be communicated directly to a non-supervisor employee." (*Id.*) The parties agreed that these "occasions will not constitute a co-employment situation." (*Id.*)

This paragraph also divides the parties' responsibilities in hiring, suspending, and reassigning security officers. In particular, while Paragraph 3(E)(9) provides in relevant part that PSC is responsible for hiring security officers for the Buckland Hills Mall, Paragraph 3(E)(10)

directs that PSC "shall suspend" any security staff member from duties at the Buckland Hills Mall if they are under investigation or determined to have committed a "crime or violation of public trust." (Sec. Agreement. ¶ 3(E)(9), (10).) Moreover, in Paragraph 3(E)(11), PSC agreed that "upon request by [GGP], it will reassign any of its employees who, in the opinion of [GGP], are not satisfactory provided that the reassignment is performance based." (Sec. Agreement. ¶ 3(E)(11).)

Paragraph 3(F) sets requirements for PSC's "On-Site Security Management." (Sec. Agreement ¶ 3(F).) The second subparagraph of that section provides the responsibilities of the PSC 'security manager':

> 2. Security Manager. The Security Manager is to be a security practitioner responsible for the daily operation of the security program and the execution of contract requirements. The on-site Security Manager must understand local laws/violations commonly encountered in shopping center environments and must be able to analyze crime reports and identify trending. The Security Manager must be capable of delivering training, developing training assistants, and maintaining the training program in accordance with the requirements set forth in **Exhibit B**. [ . . .]

(Sec. Agreement. ¶ 3(F)(2).)

Paragraph 3(G), captioned "Deployment/Scheduling," provides PSC's and GGP's obligations in setting staffing levels. The first two subparagraphs of the section provide in relevant part as follows:

> 1. Staffing Levels/Deployment/Staffing Template. [GGP] and [PSC] shall agree upon the weekly deployment of staffing template needed to provide the [security services] to the [Buckland Hills Mall].
>
> The agreed upon weekly staffing deployment template for each day of the week and each hour of the day shall be documented in [GGP's] required format in **Exhibit A**. The staffing level shall be conclusively deemed for all purposes to be a material representation by [PSC] to [GGP] that the staffing deployment is one which shall provide the [security services] to the [Buckland Hills Mall] in accordance with the terms hereof. [PSC] may make temporary changes to the weekly staff deployment to address incident trending or special events, but may not exceed the allocated weekly security hours without prior written approval from the [GGP] Property Manager. [PSC] may not make permanent or extended changes to the

weekly staffing deployment template without consent of the [GGP] Property Manager and the GGP Corporate Security Director. It is understood that the agreed upon weekly staff deployment is a flexible template and at times that [PSC] may operate with different staffing levels due to training, administrative duties, and scheduling conflicts.

[. . .]

2. Staffing. [PSC] shall provide the [GGP] Property Manager with a staffing proposal that reflects the agreed upon weekly staffing deployment. The staffing proposal shall set forth the approved positions and corresponding hours, wage rates, bill rates and line total, weekly and annual totals. The staffing proposal will also set forth estimated charges for staff working on holidays (as approved in this Agreement), special hours to be utilized during holiday season, taxes, and any other charge agreed to by the [GGP] Property Manager or the GGP Corporate Security Director. Any change proposed [by PSC] shall only be effective if approved in writing by the GGP Corporate Security Director or the [GGP] Property Manager.

(Sec. Agreement. ¶ 3(G)(1), (2).)

Next, Paragraph 3(I), captioned "Customer Experience," provides that GGP "has adopted a customer experience objective to further its stated corporate mission a form of which is attached to this Agreement as Exhibit C," and that PSC is required to take reasonable steps to ensure that its employees follow these objectives. (*See* Sec. Agreement ¶ 3(I).) Exhibit C to the agreement, captioned "Customer Service Guidelines," provides in its introduction that:

The GGP Brand is about connecting with each of our Guests; offering them world-class retail and restaurants; but also unexpected services, amenities, and conveniences; and truly exhilarating events and activities.

[. . .]

All of our Guests deserve our total commitment and respect. Each deserves a helping hand whenever we can extend one. Each deserves our kindness, our support and our empathy.

When we talk about surprising and delighting our Guests, we mean all of them. **YOU** are the face of the mall experience. **YOU** are its expression and its fulfillment.

(ECF No. 97-10 at 33.)

Paragraph 3(J), "Training," provides in relevant part that PSC would either develop training courses according to a GGP-prescribed set of core classes or administer proficiency tests on these subjects:

> 1.  Officer Training. [PSC] shall promote and provide a trained and capable security staff. [PSC] shall develop and deliver training courses as set forth on the attached **Exhibit B** to all security officers. [. . .] [GGP] may expand the training requirements as business needs dictate during the Term, in its sole discretion.
>
> 2.  Certification Training. Training that requires certification may be acquired through a professionally recognized third party training system or an equivalent program developed by [PSC]. [PSC] is responsible for maintaining all required certifications.
>
> 3.  Proficiency Testing. In lieu of training, [PSC] may administer a detailed "proficiency" test to meet requirements of **Exhibit B**. GGP Corporate Director reserves the right to review such tests in advance.
>
> [. . . .]

(Sec. Agreement. ¶ 3(J)(1)–(3).)  Exhibit B contains a list of "required" training courses that "mall security officers working at the [Buckland Hills Mall are required to] successfully complete." (ECF No. 97-10 at 29.)  These required courses vary in subject matter, from "Pepper Stream Certification" to "Workplace Violence Prevention." (*Id.* at 29–32.)

Paragraph 4(A) of the Security Agreement provides that PSC must provide a "complete set of uniforms and accessories" to its employees.  (Sec. Agreement. ¶ 4(A).)  It further specifies the requirements for certain uniforms:

> D.  Regular Security Uniform. Unless otherwise directed by Owner in writing by GGP VP of Security, the regular security uniform will be the standard patrol uniform for interior and exterior security patrol as depicted on **Exhibit D** attached to this Agreement.

(Sec. Agreement. ¶ 4(D).)  Exhibit D, captioned "uniform specifications," contains a picture of a "standard security uniform" accompanied by a description of the uniform.  (ECF No. 97-10 at 35.) Paragraph 4(H) provided that "[g]ear/tools will be provided by [PSC]."  (Sec. Agreement. ¶ 4(H).) In other words, PSC agreed to provide both uniforms and equipment to its employees.

Paragraph 5 addresses the provision of certain other "Equipment."  For example, subparagraph 5(A) and (B) provide that either GGP or PSC may provide security vehicles for PSC's use.  (Sec. Agreement ¶ 5(A) ("[GGP] may provide a variety of security vehicles and equipment for patrol at the [Buckland Hills Mall]."), *id.* ¶ 5(B) ("[GGP] may request that [PSC]

provide Security Vehicles for patrol at the [Buckland Hills Mall].").  Subparagraph 5(G) further

provides in relevant part that, except for office supplies and a duty cellphone, GGP was obligated

to permit PSC to use a variety of other equipment, including telephones, a radio system, a digital

camera, and internet connectivity:

> (i) <u>Security Office Supplies and Equipment.</u> [PSC] shall provide all necessary office supplies and equipment for the day-to-day operation of the security office at the [Buckland Hills Mall]. [. . .]

> <u>Telephones Systems.</u> [GGP] shall provide necessary telephones and telephone service for the security office. [. . .]

> (iii) <u>Cellular Duty Phone.</u> [GGP] may provide a cellular telephone and service for the on-site security supervisor during duty, which is to be used for business purposes only. [. . .]

> (iv) <u>Radio System.</u> [PSC] shall be allowed to use [GGP's] two-way radio system to support the security program. Except as provided herein, [GGP] shall continue financial and administrative responsibility for the licensing, acquisition, installation, repair and maintenance of such equipment (radios, batteries, repeaters, chargers, etc.).  [. . .]
> [. . .]
> (ix) <u>Digital Camera.</u> [GGP] shall provide a digital camera for [PSC's] use at the [Buckland Hills Mall]. [PSC] will be responsible for the camera and will replace it if lost or damaged by [PSC].

> (x) <u>Internet Connectivity.</u> [GGP] shall provide high speed internet connectivity for security computers in the security office. [PSC] shall be required to comply with all of [GGP's] policies regarding computer usage. [. . .]

(Sec. Agreement. ¶ 4(G)(i), (iii), (iv), (ix), (x).)

In Paragraph 7, PSC agreed to provide health insurance to its security officers, as required

by applicable law.  (Sec. Agreement. ¶ 7.)  Paragraph 8(b) provides that PSC would maintain

liability insurance meeting certain requirements that named GGP and other entities GGP required

as additional insureds.  (Sec. Agreement. ¶ 8(b).)  PSC also agreed in Paragraph 8(e) to "defend,

indemnify, and hold harmless" GGP and its affiliates for certain covered claims, including suits

caused by any actual or alleged negligent act by PSC's employees at the Buckland Hills Mall.

(Sec. Agreement. ¶ 8(e).)

Finally, in paragraph 9(G), PSC specifically warranted that it was an independent contractor, not an agent or employee of GGP. (Sec. Agreement ¶ 9(G) ("[PSC] warrants and represents that it is not an agent or employee of [GGP] or the [Buckland Hills Mall], but is an independent contractor.").)

## B.    The March 18, 2017 Incident

On March 18, 2017, Sterling Jewelers employees Jamileth Anes ("Anes") and Carmen Santos ("Santos") were working at the Kay Jewelers store at the Buckland Hills Mall. (Def.'s L.R. 56(a)1 Stmt. ¶ 1 (citing ECF No. 97-5, Deposition of Carmen Santos ("Santos Dep.") Tr. 32:1-40:22, 79:15-80:20; ECF No. 97-6, Deposition of Jamileth Anes ("Anes Dep.") Tr. 7:24-10:13, 15:3-17:17); Pl.'s 56(a)2 Stmt. ¶ 1.) Anes and Santos observed a man looking into the store; the parties dispute whether they suspected him of previously attempting to commit fraud at the store. (Def.'s L.R. 56(a)1 Stmt. ¶ 1; Pl.'s 56(a)2 Stmt. ¶ 1.)[2] Santos called mall security. (Def.'s L.R. 56(a)1 Stmt. ¶ 1; Pl.'s 56(a)2 Stmt. ¶ 1.) On the call, Santos told mall security that there was a gentleman outside their store who had been in Kay Jewelers about a week ago with credit cards, and they thought he might do a "grab-and-run"; she asked mall security to stand by. (ECF No. 97-5, Santos Dep. Tr. 40:2-40:22.)[3]

Two security officers employed by PSC, Shevada Davis and Matt Vieweg, were dispatched to Kay Jewelers in response. (Def.'s L.R. 56(a)1 Stmt. ¶ 2; Pl.'s 56(a)2 Stmt. ¶ 2.) Manchester Police Officer John Decker was entering the Buckland Hills Mall when he was approached by a

---

[2] The parties identify this and other facts as disputed, but in not all of these instances did the parties submit evidence that raises a genuine dispute, complies with the Local Rules, or is material. I nonetheless identify the facts as disputed here, and discuss below whether particular facts are genuinely disputed.

[3] Wade does not dispute the content of the call. (Pl.'s 56(a)2 Stmt. ¶ 1 (disputing whether Santos and Anes suspected the man from the week prior but admitting remainder).)

mall security officer who relayed the information provided in the call by Santos. (Def.'s L.R. 56(a)1 Stmt. ¶ 3; Pl.'s 56(a)2 Stmt. ¶ 3.) Specifically, Vieweg told Officer Decker that mall security was called by an employee at Kay Jewelers who reported seeing a person they believed was a suspect in a fraud/larceny that had occurred previously at this location. (*See* ECF No. 97-4, Deposition of John Decker ("Decker Dep.") Tr. 11:4-21; ECF No. 97-8, Deposition of Matthew Vieweg ("Vieweg Dep.") Tr. 15:10-16:8 (both cited in Def.'s L.R. 56(a)1 Stmt. ¶ 3)[4].) Officer Decker found Wade in the middle of a mall common area and asked to see identification. (Def.'s L.R. 56(a)1 Stmt. ¶ 4; Pl.'s 56(a)2 Stmt. ¶ 4.) The parties dispute whether Decker merely approached or actually "stopped" Wade. (Def.'s L.R. 56(a)1 Stmt. ¶ 4; Pl.'s 56(a)2 Stmt. ¶ 4.)[5] Wade cooperated with Decker's request and provided his driver's license and security guard identification, though the parties dispute whether any cooperation was voluntary. (Def.'s L.R. 56(a)1 Stmt. ¶ 5; Pl.'s 56(a)2 Stmt. ¶ 5.) Davis and Vieweg stood several feet away while Decker spoke briefly with Wade and checked Wade's identification with Manchester police dispatch. (Def.'s L.R. 56(a)1 Stmt. ¶ 6; Pl.'s 56(a)2 Stmt. ¶ 6; *see* ECF No. 97-7, Deposition of Shevada Davis ("Davis Dep.") Tr. 21:14-19, 61:9-12, 73:17-74:5; ECF No. 97-8, Vieweg Dep. Tr. 18:4-25).) Wade initially declined to walk with Officer Decker towards Kay Jewelers, but ultimately

---

[4] Vieweg actually testified that he told Officer Decker that Kay said the man had potentially defrauded a store in Holyoke, Massachusetts, but because the above statement in GGP's Local Rule 56(a)1 statement is adequately supported and Wade admits it, any discrepancy does not matter. (ECF No. 97-8, Vieweg Dep. Tr. 15:10-15:15.)

[5] As discussed below, Wade also provides evidence suggesting that *Davis* first stopped Wade, pulled him aside, and said that a Kay Jewelers' employee had identified Wade as a fraud or larceny suspect over the past several months. (*See* Pl.'s 56(a)2 Stmt. ¶ 7; ECF No. 97-2, May 10, 2017 Deposition of Fabian Wade ("Wade (May 2017) Dep.") Tr. 46:8-12, 70:8-11; ECF No. 97-3, May 2, 2018 Deposition of Fabian Wade ("Wade (May 2018) Dep.") Tr. 9:10-22, 131:25-132:8.)

did so—though the parties again dispute whether this decision was voluntary.  (Def.'s L.R. 56(a)1 Stmt. ¶ 8; Pl.'s 56(a)2 Stmt. ¶ 8.)

At some point, the interaction ended.  The parties dispute whether Wade was actually detained at any time during the incident or was always free to walk away.  (Def.'s L.R. 56(a)1 Stmt. ¶ 7; Pl.'s 56(a)2 Stmt. ¶ 7.)  In his brief opposing the Defendants' motion to dismiss, Wade admitted that he was not claiming that the mall security officers or MPD Decker "targeted Plaintiff for suspicion of a crime based on his race or color of skin."  (ECF No. 50 at 6.)

The parties dispute whether Davis, Vieweg and a third PSC security officer, Kevin Crosby,[6] were GGP's agents.  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 12–13; Pl.'s 56(a)2 Stmt. ¶¶ 12–13.) The parties also dispute whether all three were employed by PSC, and not GGP, or wore security uniforms with a PSC logo.  (*See* Def.'s L.R. 56(a)1 Stmt. ¶ 13; *see also* Pl.'s L.R. 56(a)2 Stmt. ¶ 13 (denying the above).)

## II.    Legal Standard

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "In making that determination, a court must view the evidence in the light

---

[6] Crosby appears to have been a dispatcher at the Buckland Hills Mall.  (*See* ECF No. 97-9, Deposition of Kevin Crosby ("Crosby Dep.") Tr. 10:15-23; ECF No. 93-2 ("Security Director Activity Detail" lists Crosby as "Dispatcher" on March 18, 2017).)  However, neither GGP nor Wade points to any evidence in their briefs or Local Rule 56(a) statements indicating any specific conduct by Crosby in connection with the incident.  GGP's opening brief states: "Sterling Jewelers' manager Carmen Santos called PSC security dispatcher Kevin Crosby to report that a suspicious male who had attempted credit card fraud a week earlier had returned after Sterling Jeweler'[s] employee Jamileth Anes believed she recognized Plaintiff who she observed standing outside of the Sterling Jeweler's store as a man who had provided multiple names and attempted to use multiple declined credit cards repeatedly the week prior."  (ECF No. 97-1 at 10.)  However, the evidence GGP cites in support indicates only that Santos called security based on Anes' belief that the man from the prior incident was in front of Kay Jewelers.  (ECF No. 97-6, Anes Dep. Tr. 8:2-10:18, 15:3-14; ECF No. 97-5, Santos Dep. Tr. 32:1-40:22, 79:15-80:20.)

most favorable to the opposing party." *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "A fact is material when it might affect the outcome of the suit under governing law," and "an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . ., and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (internal citations omitted).

## III. Discussion

Wade argues that GGP's motion for summary judgment should be denied because GGP is liable for the torts of the mall security guards under agency principles, and that genuine disputes of material fact preclude summary judgment on the false imprisonment, negligent infliction of emotional distress, and negligent supervision claims involving those guards. (ECF No. 102 at 8–14, 16–27, 31–34.) Wade repeats these arguments in opposing PSC's motion for summary judgment. (ECF No. 101 at 8–15, 17–27, 32–35.) Because the record shows that GGP is not liable for the torts of the mall security guards under agency principles and in any event is entitled to summary judgment as to each of the claims against it, I grant GGP's motion for summary judgment. I thus need not reach Wade's arguments concerning PSC's motion and deny that motion as moot.

### A. GGP's Motion for Summary Judgment

GGP asserts that it cannot be held liable for any of the torts of the PSC-employed security guards because PSC is an independent contractor providing security services, and thus GGP is

entitled to summary judgment on all counts. (ECF No. 97-1 at 12–18.) Wade counters that genuine disputes of fact exist over whether GGP is liable under an exception to the usual rule of non-liability for independent contractors due to GGP's reservation of control over PSC in the Security Agreement, or in the alternative because GGP is liable under the doctrine of apparent agency. (ECF No. 102 at 8–14.) Wade has not raised a genuine dispute of material fact on either issue, and so summary judgment in GGP's favor is appropriate on this ground alone. However, GGP further argues that even if the PSC-employed security guards were GGP's agents, summary judgment is appropriate on Wade's false imprisonment, negligent infliction of emotional distress, and negligent supervision claims against GGP, which Wade contests. (ECF No. 97-1 at 19–27, 32–35; ECF No. 102 at 16–27, 31–34.) I conclude that even if GGP could be held liable for torts by PSC's employees under agency principles, GGP would still be entitled to summary judgment on these claims.

### 1. *Exception to the Non-Liability Rule for Independent Contractors*

Wade argues that GGP should be held vicariously liable for PSC's employees' torts because, although they were actually employed by PSC, GGP reserved general control over PSC's employees in the Security Agreement. (ECF No. 102 at 9–10.) "As a general rule, an employer is not liable for the negligence of its independent contractors." *Pelletier v. Sordoni/Skanska Construction Co.*, 264 Conn. 509, 517 (2003) (citation and quotation marks omitted). GGP's motion argues that PSC is an independent contractor for which GGP has no liability, relying on both the Security Agreement and the testimony of the mall security guards. (ECF No. 97-1 at 12–16; *see also* Def.'s L.R. 56(a)(1) Stmt. ¶¶ 12, 13; ECF No. 97-7, Davis Dep. Tr. 9:5-7; ECF No. 97-8, Vieweg Dep. Tr. 9:12-10:7, 39:12-40:18; ECF No. 97-9, Crosby Dep. Tr. 8:20-9:11.) Wade admits that the Security Agreement designated PSC as an independent contractor, and his brief

does not challenge GGP's argument that PSC was its independent contractor. (*See* ECF No. 102 at 9 ("There is no dispute that PSC is designated as an independent contractor of GGP . . . . The issue here is whether any exceptions exist[] to the nonliability rule that a contractee or proprietor is not liable for injuries caused by an independent contractor to another person[.]").) Wade instead argues that an exception applies because GGP reserved "control" over PSC's employees in the Security Agreement. (ECF No. 102 at 9.)

Under Connecticut law, a party may be held liable for the torts of its independent contractor where the party "reserve[s] in his contract general control over the contractor or his servants, or over the manner of doing the work." *Pelletier*, 264 Conn. at 518. Nonetheless, an employer "may exercise a limited degree of control or give the contractor instructions on minor details without destroying the independent character of the contractor." *Mozeleski v. Thomas*, 76 Conn. App. 287, 293 (2003). To impose liability on an employer for the acts of an independent contractor:

> The employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Restatement (Second) of Torts § 414 cmt. c (1965); *see Mozeleski*, 76 Conn. App. at 293 (citing the Restatement). On summary judgment, "[w]here the evidence on the question as to who had control of the area or instrumentality causing the injury is such that the mind of a fair and reasonable [person] could reach but one conclusion as to the identity of the person exercising control, the question is one for the court . . . ." *Pelletier*, 286 Conn. at 599 (citation omitted). Wade argues that GGP retained control over the security guards based on seven sets of provisions

in the Security Agreement. Because the Security Agreement supports only one conclusion—that PSC, not GGP, controlled PSC's security guards—I reject Wade's argument.[7]

First, Wade argues that "GGP determined and controlled the number of hours to be performed," citing paragraph 3(D)(2) of the Security Agreement. (ECF No. 102 at 10; Sec. Agreement ¶ 3(D)(2).) But read in light of the rest of paragraph 3(D), that provision clearly establishes the opposite—that *PSC* controlled the number of hours worked in the first instance. Paragraph 3(D)(1) requires that PSC "establish a corporate management group dedicated to the Property" which would be "responsible for fulfillment of [GGP's] performance standards." (Sec. Agreement ¶ 3(D)(1).) Paragraph 3(D)(2) provides that the management group would consist of "security practitioners responsible for the overall success of the on-site security program and the execution of all applicable requirements set forth in this Agreement." (Sec. Agreement ¶ 3(D)(2).) The subparagraph further states in relevant part that PSC's "assigned regional manager [for each mall] shall manage no more than 8,000 hours of security [c]overage per week" unless GGP grants an exception. (*Id.*) In sum, GGP set a soft cap on man-hours above which further approval would be needed, but left up to PSC how to set up its management team and to determine how many weekly man-hours each mall required. The soft cap on hours and GGP's approval right are simply general requirements on when GGP would need to approve coverage, not "control[] as to [PSC's] methods of work, or as to operative detail." Restatement (Second) of Torts § 414 cmt c; *see also Pelletier v. Sordoni/Skanska Const. Co.*, 286 Conn. 563, 601–02 (2008) (concluding that general

---

[7] Although the parties both cite provisions of the Agreement in support of their arguments, they do not appear to dispute the meaning of the contractual language, and neither party suggests that the Agreement is ambiguous. The dispute is over the effect of the Agreement's provisions on the question of the degree of control reserved by GGP over PSC. I thus need not consider the effect of Illinois law – which the Agreement selects as the law governing its construction – on the interpretation of the Agreement, and the parties do not suggest otherwise.

contractor could not be held liable for subcontractor's negligence where the contract required the subcontractor to fabricate and inspect all structural steel elements at issue and general contractor could only require that the inspections be performed).

Second, Wade argues that GGP reserved "general control over its mall security guards" in paragraph 3(F). (ECF No. 102 at 10; *see* Sec. Agreement. ¶ 3(F).) But this paragraph governs the responsibilities of and requirements for the "Security Manager," a *PSC* employee. (*See* Sec. Agreement. ¶¶ 3(E)(1) ("[PSC] will provide an on-site security manager ('Security Manager'). . . ."), 3(F) ("On-Site Security Management").) It further provides that among those responsibilities, "[t]he Security Manager is to be a security practitioner responsible for the daily operation of the security program and the execution of contract requirements." *Id.* ¶ 3(F)(2). Although there is language in this paragraph requiring approval by GGP of work by the Security Manager not involving the mall (*id.* ¶ 3(F)(5)), nothing in this section of the Agreement suggests that GGP controlled how PSC personnel performed their responsibilities under the Agreement.

Third, Wade argues that GGP reserved control in paragraph 3(G) by setting the weekly hours and hourly wages of the security guards. (ECF No. 102 at 10.) Paragraph 3(G) does provide that "[GGP] and [PSC] shall agree upon the weekly deployment of staffing template needed to provide the [security services as described in the Agreement] to the [Buckland Hills Mall]." (Sec. Agreement ¶ 3(G)(1).) It continues: "The agreed upon weekly staffing deployment template for each day of the week and each hour of the day shall be documented in [GGP's] required format in **Exhibit A**," to be provided by *PSC* to GGP. (*Id.*) Exhibit A is an "[a]nnual [e]stimate" of the "Property Staffing . . . and Billing Rates" for the Buckland Hills mall, which does include estimated billing rates and hours for particular levels of employees. (ECF No. 97–10 at 27–28.) Nonetheless, paragraph 3(G)(1) expressly provides that "the agreed upon weekly staff deployment is a flexible

template and at times . . . [PSC] may operate with different staffing levels due to training, administrative duties, and scheduling conflicts." (Sec. Agreement ¶ 3(G)(1).) Further, paragraph 3(G)(2) provides that PSC will provide GGP "with a staffing proposal that reflects the agreed upon weekly staffing deployment" and "set[s] forth the approved positions and corresponding hours, wage rates, bill rates and line total, weekly and annual totals." (Sec. Agreement. ¶ 3(G)(2).) In other words, Exhibit A does not affirmatively set billing and hours requirements but, read in light of sections 3(G)(1) and 3(G)(2), is simply an example of the format in which <u>PSC</u> is expected to provide its estimated weekly staffing and billing rates, which GGP then approves and which PSC is free to deviate from on a day-to-day basis. GGP's sign-off on weekly staffing and billing proposals for PSC's security guards is akin to a weekly bill or status report, not control of the "operative detail" on how PSC goes about guarding the Buckland Hills Mall. *See Darling v. Burrone Bros.*, 162 Conn. 187, 193 (1972) ("The fact that [the general contractor] was present at the job site, indicated to [the subcontractor] where to dig the ditch and how deep to dig it, periodically checked to make sure the depth was accurate and marked the area establishing the location of the lateral [pipe] by sticks imbedded in the ground signifies no more than the furnishing of specifications for the job. It does not demonstrate control of the manner and means of accomplishing the digging. It is apparent that [the employer] did no more than exercise his right to supervise the general result and also the immediate results, from time to time, as the work progressed."); *900 Shelton Plaza Assocs. v. AT & T*, No. CV126008994, 2014 WL 5569314, at *3 (Conn. Super. Ct. Oct. 1, 2014) (finding no contractual control based on employer's right to ensure compliance with plans and specifications).

Fourth, Wade argues that GGP reserved general control by setting and determining the dress code for mall security. (ECF No. 102 at 10.) Wade's reading of the contract in this regard

is correct, as paragraph 4 and Exhibit D to the Security Agreement provides specific, depicted requirements for the uniform for mall security personnel. (*See* Sec. Agreement ¶ 4(D) ("[T]he regular security uniform will be the standard patrol uniform for interior and exterior security patrol as depicted on Exhibit D attached to this Agreement" absent an exception).) Nonetheless, setting uniform requirements for mall security does not control the "methods of work" or "operative detail," just as a hospital's requiring a contracted doctor to wear a white coat and stethoscope would not alone make her a hospital employee. *See, e.g., Greene v. Quraishi*, No. CV136045815S, 2017 WL 960733, at \*4 (Conn. Super. Ct. Jan. 25, 2017) (granting summary judgment where independently contracted doctor's provision of services at medical center did not raise "material dispute as to the understanding between [doctor] and [medical center] that [medical center] had a right to control [doctor's] clinical decisions on how to diagnose and treat" a patient); *see also Norwalk Gaslight Co. v. Borough of Norwalk*, 63 Conn. 495 (finding that detailed contractual requirements about manner of laying of gas pipes did not obviate that "general control over the work, as to the manner and method of its execution. . . remained in the contractor"). Moreover, as discussed below, the uniforms actually worn by the PSC security personnel in this case bore PSC logos.

Fifth, Wade argues that GGP reserved control by setting training requirements. (ECF No. 102 at 10.) Indeed, the Security Agreement attaches an Exhibit B, captioned "Training Requirements [/] Basic Training" that "mall security officers working at the [Buckland Hills Mall are required to] successfully complete. . . ." (ECF No. 97-10 at 29–32.) However, even though GGP sets the general content of training, the Security Agreement makes clear that PSC is responsible for providing a trained staff. (Sec. Agreement ¶ 3(J)(1) ("[PSC] shall promote and provide a trained and capable security staff.").) Accordingly, the Security Agreement permits PSC

to train its staff either by developing courses itself, obtaining certifications through a third-party system, or by administering proficiency tests. (Sec. Agreement ¶ 3(J)(1)–(3).) Again, setting minimum specifications for the job does not rise to control of the operative details. *See Norwalk Gaslight Co.*, 63 Conn. 495 (finding no control where contract provided specifications for the work and right to ensure compliance therewith); *900 Shelton Plaza Assocs.*, 2014 WL 5569314, at *3 (same).

Sixth, Wade argues that GGP reserved control by "owning and controlling the main security work tool, the security TV monitoring systems – American Dynamics' CCTV systems." (ECF No. 102 at 11.) But the provision Wade cites, paragraph 3(D)(5), simply provides that PSC will provide a "master trainer" to train the rest of its employees on the existing CCTV camera system. (Sec. Agreement ¶ 3(D)(5) ("[PSC] will provide and maintain at its corporate office at least one dedicated CCTV master trainer for [GGP's] American Dynamics' CCTV systems.").) There is no evidence that GGP actually controlled the operation of the CCTV system, and the contract itself indicates that PSC employees are responsible for its operation. (*See id.* ("The master trainer will be responsible for overseeing the training program for [PSC's] staff *assigned to operate* [GGP's] CCTV systems.") (emphasis added).)[8]

Seventh and finally, Wade argues that GGP reserved control by "owning and controlling all other security equipment (except for office supplies [. . .]), including security vehicles, security communication systems, telephone service system, cellular telephones, two-way radio systems,

---

[8] Wade raises a spoliation issue with respect to GGP's supposed destruction of a videotape of the incident. (ECF No. 102 at 11.) It is not clear how this is relevant to the question of whether GGP exercised control over PSC. In any event, as later discussed, Wade never brought a discovery motion seeking an adverse inference and there is no evidence that any destruction was intentional, as Rule 37(e) would require before the Court could draw the adverse inference Wade seeks. Fed. R. Civ. P. 37(e)(2).

digital camera system, and internet service." (ECF No. 102 at 11 (citing Sec. Agreement ¶ 5(A), (G).) Wade's argument ignores the provision of the Agreement requiring PSC to provide "[g]ear/tools" for its security guards. (Sec. Agreement. ¶ 4(H).) Paragraph 5 addresses the provision of certain other "Equipment," including security vehicles, which may be provided by *either* GGP or PSC. (Sec. Agreement ¶ 5(A) ("[GGP] may provide a variety of security vehicles . . .") (emphasis added); *id.* ¶ 5(B) ("[GGP] may request that [PSC] provide Security Vehicles for patrol at the [Buckland Hills Mall].").) The Agreement does require that GGP provide some of the remaining equipment, but as GGP observes, "the agreement recognizes that the owner's property stays their own, and that PSC may use it to fulfill their obligations as an independent contractor." (ECF No. 103 at 6; Sec. Agreement ¶ 5(G)(i), (iv), (vi), (ix), (x) (providing that GGP shall provide telephone communication systems, a digital camera, internet service, and allow PSC to use its two-way radio system); *id.* ¶ 5(G)(iii) ("[GGP] may provide a cellular telephone and service . . . .").) In other words, the fact that GGP made certain other resources available to PSC for use does not rise to controlling the "methods of work" or "operative detail," especially given that PSC is itself required to provide its employees gear, tools, and "office supplies and equipment for the day-to-day operation of the security office." (Sec. Agreement ¶ 5(G)(i).)

Other provisions of the Security Agreement also make clear that GGP did not reserve control over the method or manner of PSC's work. The Agreement explicitly provides that PSC is an independent contractor, and that PSC's security guards are PSC's, not GGP's, employees or agents. (Sec. Agreement. ¶¶ 3(E)(3), 9(G).) PSC is responsible for hiring its own security officers for the Buckland Hills Mall and providing them with uniforms, gear, health insurance, and training. (Sec. Agreement. ¶¶ 3(E)(9)), 3(J)(1), 4(A), 4(H), 7.) The Agreement further envisions that security-related communications are in the usual course between the designated supervisors for

both GGP and PSC, which suggests that it remains up to PSC's management to decide how to implement responses to requests from its customer – GGP is not, in the ordinary course, to give instructions directly to PSC's line employees. (Sec. Agreement. ¶ 3(E)(3).) And when emergencies require GGP to communicate directly with those employees, the Security Agreement warrants that such communications do not constitute any co-employment, implying the parties intended to preserve the two separate chains of command. (*Id.*) Although the Agreement's constriction of PSC's discretion to suspend employees who are accused or convicted of a "crime or violation of public trust," as well as GGP's unilateral ability to have PSC mall security officers "reassign[ed]" for performance-based reasons, favor a contrary determination (Sec. Agreement. ¶¶ 3(E)(10), (11)), these partial reservations of control are insufficient on their own. *See Norwalk Gaslight Co.*, 63 Conn. 495 (affirming independent contractor jury instruction where contract, *inter alia*, specified generally how work should be done and reserved employer's right to confirm compliance with those specifications and to direct the removal of inadequate employees or tools, because the "reservations of control . . . [were] partial, and existing in certain respects only."). In addition, PSC agreed not only to name GGP and its affiliates as additional insureds for its liability insurance, but also to defend and indemnify GGP for any claims arising out of the Agreement, including for any alleged negligent act by PSC's employees at the Buckland Hills Mall like those Wade now claims. (Sec. Agreement. ¶ 8(b), (e).) In other words, PSC itself assumed the risk of liability arising out of the security it had agreed to provide at the Buckland Hills Mall. Although GGP set the general requirements, it is clear from the Security Agreement that GGP did not reserve control over the method or manner of PSC's work. *See 900 Shelton Plaza Assocs.*, 2014 WL 5569314, at *3 (granting summary judgment to employer where "provisions of the agreement pertaining to the [employer's] right to inspect [independent contractor's] work, ensure compliance

with the plans and specifications, and to do the described work itself or employ other companies to do it" did not demonstrate that "defendant retained the right to control the manner and means used by [independent contractor]").

Further, the only evidence in the record concerning actual performance of the Agreement points to the conclusion that GGP did not control the method or manner of PSC's work. Davis, Vieweg, and Crosby testified that they were PSC employees, and Vieweg testified that he and Davis wore a uniform with PSC's logo. (*See* Def.'s L.R. 56(a)1 Stmt. ¶ 13; ECF No. 97-7, Davis Dep. Tr. 9:5-7; ECF No. 97-8, Vieweg Dep. Tr. 9:12-10:7, 39:12-40:18; ECF No. 97-9, Crosby Dep. Tr. 8:20-9:11.)[9] Wade has submitted no evidence suggesting that GGP in practice had any role in the day-to-day operation of security at the mall. *See Mozeleski,* 76 Conn. App. at 293 (granting summary judgment where nonmovant did not file a counteraffidavit or any other supporting documents to contradict movant's evidence of non-control).

With respect to the events from which Wade's claims arise, there is no evidence in the record suggesting that GGP supervised or played any other role in directing the actions of the PSC security guards. Rather, the undisputed evidence shows that, after Santos called mall security to report Wade, two security officers employed by PSC – Davis and Vieweg – were dispatched to Kay Jewelers in response. (Def.'s L.R. 56(a)1 Stmt. ¶ 2; Pl.'s 56(a)2 Stmt. ¶ 2.) Although there is a dispute (discussed later) over whether Vieweg assisted Officer Decker to stop Wade by identifying him or whether Davis independently stopped Wade before Officer Decker arrived, the

---

[9] Wade's L.R. 56(a)2 Statement purports to dispute Vieweg, Davis, and Crosby's testimony that they were PSC employees or did not wear uniforms with a PSC logo. (*Compare* Def.'s L.R. 56(a)1 Stmt. ¶ 13 *and* Pl.'s L.R. 56(a)2 Stmt. ¶ 13). Wade's denial is based solely on the Security Agreement, not evidence of actual practice (and in any event nothing in the Security Agreement supports Wade's reading), and so he does not raise a "genuine" dispute as to whether Davis, Vieweg, or Crosby were PSC employees or wore uniforms with PSC logo.

parties agree that after Wade was stopped, Davis and Vieweg stood several feet away while Officer Decker checked Wade's identification with Manchester police dispatch. (Def.'s L.R. 56(a)1 Stmt. ¶ 6; Pl.'s 56(a)2 Stmt. ¶ 6.) The parties do not point to any evidence at all of relevant conduct by Crosby, the only other PSC employee mentioned in their papers and Local Rule statements. Nor do they point to evidence of any conduct by a GGP employee. Accordingly, there is simply no evidence that GGP exercised any control over the judgments made by the PSC employees regarding how to respond to calls, when to summon the police, and how to approach a suspect, either generally or in connection with the March 18, 2017 incident. *See also Darling*, 162 Conn. at 194 ("It is also undisputed that [the general contractor] in no manner told [the subcontractor] how to dig the ditch or slope its sides."); *compare Lombardi v. Luanci Const.*, No. CV136038009S, 2015 WL 601317, at *2 (Conn. Super. Ct. Jan. 22, 2015) (denying motion for summary judgment where non-movant submitted evidence that employer frequented the premises during independent contractor's construction and was involved in the decision-making process but it was disputed whether employer gave specific instructions concerning major changes to the construction).

I conclude that Wade has failed to point to any evidence in the record suggesting that an exception to the usual rule of non-liability for independent contractors applies.

### 2. *Apparent Agency*

Wade next argues that even if GGP does not have control over its independent contractors, it is still liable under the doctrine of apparent agency. (ECF No. 102 at 12–14.) In *Cefaratti v. Aranow*, the Connecticut Supreme Court set forth two ways a plaintiff could prove apparent agency in tort cases. 321 Conn. 593 (2016). Under the first standard, "the plaintiff may establish apparent agency by proving that: (1) the principal held itself out as providing certain services; (2) the plaintiff selected the principal on the basis of its representations; and (3) the plaintiff relied on the

principal to select the specific person who performed the services that resulted in the harm complained of by the plaintiff." *Id.* at 624. Alternatively, the plaintiff can show that "(1) the principal held the apparent agent or employee out to the public as possessing the authority to engage in the conduct at issue, or knowingly permitted the apparent agent or employee to act as having such authority; (2) the plaintiff knew of these acts by the principal, and actually and reasonably believed that the agent or employee or apparent agent or employee possessed the necessary authority; and (3) the plaintiff detrimentally relied on the principal's acts, *i.e.*, the plaintiff would not have dealt with the tortfeasor if the plaintiff had known that the tortfeasor was not the principal's agent or employee." *Id.* at 624–25. Wade argues that GGP is liable under the first test of apparent agency. (ECF No. 102 at 12–14.) I disagree, because Wade has not raised a genuine dispute on the second element, whether Wade selected GGP on the basis of its representations.

GGP cites Wade's own testimony to show that Wade did not select the mall on the basis of any representation it made with respect to its *security*, but instead went there to purchase merchandise. (ECF No. 97-1 at 18; ECF No. 97-3, Wade (May 2018) Dep. Tr. 8:14-15 ("I went to the mall, went there to purchase a shirt and a shoes").) This evidence "establishes the absence of a material dispute as to the second element of the first standard, i.e., that [Wade] did not rely upon any representations made to him by [GGP with respect to its security] in selecting [it]." *Greene*, 2017 WL 960733, at *4. In his opposition brief, Wade relies heavily on Exhibit C to the Security Agreement, captioned "Customer Service Guidelines," to argue that GGP holds itself out to the public as providing "shopping <u>experiences</u> to customers including [Wade]," which includes the provision of professional security guards. (ECF No. 102 at 13.) Even if this evidence raised a genuine dispute about whether GGP held itself out as providing shopping 'experiences' including

security (as opposed to shopping by itself), Wade does not put forward any evidence showing that he *relied* on this representation when he decided to shop at the Buckland Hills Mall (nor is it clear that he could have, given that Wade presumably did not possess this document until discovery). Wade thus does not raise a genuine dispute of material fact on the second element of his theory of apparent agency. *See Greene*, 2017 WL 960733, at *5 (granting summary judgment for lack of apparent agency where "plaintiffs did not submit any evidence to substantiate [that they relied on defendants' representations about wound care services] other than a copy of the ECHN webpage, which by itself, without an affidavit or a testimony that either [plaintiff] or [the referring doctor] selected ECHN on the basis of the representations made on the webpage, is insufficient to create a material dispute as to the second element . . . .").[10]

Because GGP cannot be held liable under an exception to the usual rule of non-liability for independent contractors or under a theory of apparent agency, GGP is not liable for the torts of PSC's employees. Accordingly, the Court GRANTS GGP's motion for summary judgment in its entirety.

### 3. False Imprisonment

Even if the record permitted a reasonable juror to find GGP liable under agency principles, I would still conclude that GGP is entitled to summary judgment on Wade's claims against it. I turn first to Wade's false imprisonment claim.

---

[10] To the extent Wade also attempts to argue that GGP is liable for *Sterling*'s torts under a theory of apparent agency (ECF No. 102 at 15–16), this claim fails for the same reason—that Wade has not put any forward evidence showing that he actually relied on any representation in Exhibit C to Security Agreement (or any other representation by GGP) in deciding to shop at the Buckland Hills Mall. In addition, Wade's amended complaint does not plead that Sterling's employees acted as GGP's agents, and he cannot amend his complaint through his opposition brief. (*See* ECF No. 36 at ¶ 11 (alleging that Jane Doe 1 and 2 [*i.e.*, the security guards] were "employees of *Kay Jewelers*, employed at the Kay Jewelers store at Buckland Hills Mall") (emphasis added).)

"[F]alse imprisonment is the unlawful restraint by one person of the physical liberty of another." *Berry v. Loiseau*, 223 Conn. 786, 820 (1992) (citation omitted). "To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Id.* (citation omitted). The restraint must be accomplished through the "exercise of force . . . express or implied." *Id.* at 821. "Any period of such restraint, however brief in duration, is sufficient to constitute a basis for liability." *Green v. Donroe*, 186 Conn. 265, 267 (1982); *see id.* ("The fact that there was no formal arrest of the plaintiff . . . and that he remained in the custody of the police for only ten minutes would not necessarily defeat his cause of action for false imprisonment."). In addition, "the detention must be wholly unlawful . . . ." *Lo Sacco v. Young*, 20 Conn. App. 6, 19 (1989). Nonetheless, "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Rivera v. Double A Transp., Inc.*, 248 Conn. 21, 31 (1999) (citing *Donroe*, 186 Conn. at 268). "Nothing less than a rather extreme brand of recklessness will substitute for the standard requirement of intention in false imprisonment cases." *Id.* Finally, "[a] seizure permissible under the Fourth Amendment is not 'unlawful' and therefore cannot sustain a claim of false imprisonment." *Seifert v. Rivera*, 933 F. Supp. 2d 307, 320 (D. Conn. 2013) (citation and internal quotation marks omitted); *see also Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (observing Connecticut law principle that a false imprisonment claim cannot lie where "the arrest of the plaintiff is legally authorized" (citation omitted).)

Wade argues that summary judgment is not warranted because (1) mall security personnel and Officer Decker stopped and surrounded Wade, thus effecting a confinement (ECF No. 102 at

17–20); (2) Wade did not consent to that confinement (ECF No. 102 at 20–24); and (3) mall security and Officer Decker were not authorized to stop Wade under *Terry v. Ohio*, 392 U.S. 1 (1968) (ECF No. 102 at 24–27.)  I disagree.  Even assuming that mall security effected a restraint on Wade, that any restraint was not voluntary, that GGP (through its supposed agents, the mall security officers) acted with the requisite intent, and that any restraint amounted to an investigative stop, summary judgment is nonetheless appropriate because any such stop was a *Terry* stop supported by reasonable suspicion, and thus was consistent with Fourth Amendment principles.[11]

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "[a] police officer may stop a suspect without probable cause for an arrest if the officer has a reasonable suspicion that the suspect has committed, is committing, or is about to commit a crime."  *Galan-Blair v. Busillo*, No. 3:08-CV-295 (CFD), 2010 WL 3034303, at *2 (D. Conn. July 27, 2010) (citing *Terry*, 392 U.S. 1 (1968).)  "While 'reasonable suspicion' does not have a precise definition, the standard requires an officer to have a 'minimal level of objective justification.' *Id.* (citing *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992).).  "A court must consider the 'totality of the circumstances' surrounding the stop . . . and because the test is an objective one, the subjective motivations of the individual officer are not relevant to the analysis."  *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *Glover*, 975 F.2d at 1010).  In addition, "[a]n investigative detention must be temporary and last no longer

---

[11] Wade again raises a spoliation issue in his discussion of the false imprisonment claim. (ECF No. 102 at 19.)  It is unlikely that GGP's destruction of a videotape of the incident is relevant to whether the PSC security personnel had reasonable suspicion to stop Wade, because it is undisputed that they initiated the events that led to that stop based on telephone and oral reports from Kay employees, which would not have been captured by the videotape.  In any event, Wade never brought a discovery motion seeking an adverse inference and there is no evidence that any destruction was intentional, as Rule 37(e) requires.  Fed. R. Civ. P. 37(e)(2) (adverse inference warranted "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation").  (*See* ECF No. 91-5 (e-mail between counsel claiming stating that video evidence was destroyed after 30 days in accordance with "industry standards" and before any complaint was filed or any claim anticipated).)

than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Chance v. Cundy*, No. CIV.A. 303CV40JCH, 2004 WL 2009282, at *4 (D. Conn. Sept. 7, 2004) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).) "The Second Circuit has announced several factors which help courts distinguish such investigatory stops from formal arrests, such as: the amount of force used by police, the number of officers involved, the duration of the stop, whether handcuffs were used, whether the suspect was believed to be armed, the physical treatment of the suspect by police, and the extent to which the suspect's freedom of movement was restrained." *Galan-Blair*, 2010 WL 3034303, at *2 (citing *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)).

Construing the record in Wade's favor, I find that there is a genuine dispute over whether PSC employees assisted Officer Decker to stop Wade or whether they stopped Wade themselves.[12] But this dispute is immaterial because the undisputed evidence shows that mall security had reasonable suspicion to make a stop at that point. When Santos called mall security, she reported that there was a gentleman outside Kay Jewelers who had previously been at Kay Jewelers the week before with credit cards that she thought might do a "grab-and-run." (Def.'s L.R. 56(a)1 Stmt. ¶ 1 (citing ECF No. 97-5, Santos Dep. Tr. 32–33, 40:2-40:8 ("I told them, you know, there is a gentleman. He is no longer in front of our store. He was here about a week ago. And we just

---

[12] The evidence shows either that (a) Vieweg assisted Officer Decker to stop Wade by identifying Wade, or (b) Davis independently stopped Wade before Officer Decker arrived. (*See* ECF No. 97-8, Vieweg Dep. Tr. 15:10-16:8 (testifying that he provided a description of Wade to Officer Decker); Pl.'s 56(a)2 Stmt. ¶ 7 (citing evidence of Davis stopping Wade); ECF No. 97-2, Wade (May 2017) Dep. Tr. 46:8-12 ("[Davis] first pulled me aside. She asked me can I come here, and I was, like, sure, why not. And I say what is this about, and then she just starts stating that Kay Jewelry called and said it's me that's been [robbing them] for three months."), 70:8-11, ECF No. 97-3, Wade (May 2018) Dep. Tr. 9:10-22, 131:25-132:8).)

want you to stand by just in case he tries to do a grab-and-run. He had been there before with the credit cards, so please just stand by just in case. You know, just kind of like if in case he tries to do a grab-and-run.").)  Wade does not dispute the content of the call, only that Santos did not in fact suspect the man from the previous week of any of crimes.  (Pl.'s L.R. 56(a)2 Stmt. ¶ 1.)  But regardless of what Santos believed, there is no evidence any of the PSC personnel had reason to doubt her report, which is generally presumed reliable.  *See United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007) ("Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.' . . . The veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted.") (citations omitted); *see also Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) ("A law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.") (citations omitted).  Indeed, the evidence here, which Wade has not challenged, shows that Santos at some point identified herself to PSC security personnel as an employee at the Kay Jewelers store when they arrived to interview her, and made statements indicating that she had personal knowledge that someone matching Wade's description had been involved in a previous attempted credit card fraud at the store.  (*See* ECF No. 97-5, Santos Dep. Tr. 40:5-40:7 ("He had been there before with the credit cards, so please just stand by just in case."), 40:23-25 ("[Security] came inside [Kay Jewelers after the call].  I remember that."), 48:3-6 ("I told [security] there was a gentleman staring in front of our store and he fit the description of someone that had been there originally . . . ."); *see also* ECF No. 97-7, Davis Dep. Tr. 16:1-14.)  This in-person account bolsters the reliability of Santos' initial telephone report.  *See also United States v. Rollins*, 522 F.2d 160,

164 (2d Cir. 1975) ("Specific allegations of reliability or past reliable contact are not required when the informant in question was an eyewitness to the crime.").  Wade's argument that "Davis and Vieweg [wrongly] adopted the false statement Kay Jewelers employees made to them, without questioning" is not only unsupported by the evidence, but also undercut by his own admission that "mall security responded appropriately to the report from the Kay Jewelers employees." (*See* ECF No. 102 at 26–27; Def.'s L.R. 56(a)1 Stmt. ¶ 9; Pl.'s 56(a)2 Stmt. ¶ 9.)   The undisputed evidence shows that Vieweg and Davis had obtained an apparently reliable report that a crime either had or was about to be committed, and thus had "reasonable suspicion" to approach Wade and investigate further.

Courts in this district have regularly granted summary judgment on false imprisonment claims where a police officer had "reasonable suspicion" to make an investigative stop. *See Galan-Blair*, 2010 WL 3034303, at *3 (concluding on summary judgment that officer had reasonable suspicion to make investigative stop where he received a call from a store about an individual attempting to falsely cash a check, the store owner and employee accused the plaintiff of the same crime and showed the officer a copy of the plaintiff's ID card, and the plaintiff could not produce ID on request); *Chance*, 2004 WL 2009282, at *4 (granting summary judgment on false arrest claim where police officer had reasonable suspicion to question suspect about criminal trespass based on witness' police report, previous warning to potential suspect, and suspect's violent background); *Valdez v. City of E. Hartford*, 26 F. Supp. 2d 376, 381 (D. Conn. 1998) (granting summary judgment where officers had reasonable suspicion plaintiff had committed a bank robbery because "[p]laintiff's vehicle was distinctly similar to a vehicle owned by a known black male with an outstanding warrant who had recently been observed in the area . . . .").  Wade has put forward no reason why that defense should not also protect mall security from false

imprisonment liability where the evidence shows they acted on identical information and had no reason to disbelieve Santos' report. Accordingly, mall security's reasonable suspicion that Wade had committed credit card fraud justified a *Terry* stop for further investigation and likewise protects them from liability on Wade's false imprisonment claim.

Nor was any such stop so intrusive as to ripen into a *de facto* arrest. Wade admits that he was not arrested. (ECF No. 93-1, Pl.'s L.R. 56(a)2 Stmt. for Sterling's Mot. ¶ 63.) And the facts support this admission. Once the stop was effected, there is no evidence that Officer Decker, Davis, or Vieweg used force on Wade. Officer Decker was the only police officer involved; it is undisputed that Davis and Vieweg stood several feet away while Decker spoke briefly with Wade and checked Wade's identification with Manchester police dispatch. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 3–6; Pl.'s 56(a)2 Stmt. ¶¶ 3–6.) The parties' Local Rule statements do not address how long any stop lasted, but their briefs indicate that it was between 12 and 14 minutes. (ECF No. 97-1 at 8 ("[T]welve minute interaction with MPD Decker."), ECF No. 102 at 5-7 (citing evidence that Officer Decker arrived on the scene at 12:19 P.M. and returned Wade's license to him a "minute or two" before 12:33 P.M).) There is no evidence that handcuffs were used or that Wade was believed to be armed. (*See, e.g.*, Def.'s L.R. 56(a)1 Stmt. ¶ 7 (citing ECF No. 97-4, Decker Dep. Tr. 21:9 ("[N]ever touched him, never arrested him."), 52:12-17 (same)).) The only evidence Wade raises here that his freedom of movement was restrained at all is (1) his own testimony that Davis first stopped him and pulled him aside, (2) his own testimony that Davis, Vieweg, and Officer Decker surrounded him during the stop, and (3) his own testimony that he decided to walk with Officer Decker to Kay Jewelers because he felt that he had no choice. (*See* Pl.'s L.R. 56(a)2 Stmt. ¶ 7; ECF No. 102 at 18–19 (raising evidence on being surrounded in his brief).) Even crediting that evidence and viewing it in the light most favorable to Wade, I find that it still presents

circumstances far less extreme than those which courts have treated as a permissible *Terry* stop. *See United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (concluding that where officers initially approached a potentially armed suspect in a high-crime area, suspect fled, and officers intercepted and handcuffed him before finding a firearm, "the force was reasonable under the circumstances and the stop did not become a full arrest until after the officers discovered defendant was carrying a firearm"); *Chance*, 2004 WL 2009282, at *4 (concluding on summary judgment that officer's questioning of potential suspect in an interview room for twenty minutes after individual voluntarily arrived at police station was an investigative stop, not arrest); *Valdez*, 26 F. Supp. 2d at 382–83 (concluding that six-minute *Terry* stop was not excessively intrusive where officers, believing plaintiff to be armed, drew their weapons and handcuffed plaintiff, releasing him only after determining his identity and searching for weapons). No evidence here supports a conclusion that Wade's interaction with Officer Decker or mall security ripened into a *de facto* arrest. *See Galan-Blair*, 2010 WL 3034303, at *4 (concluding on summary judgment that the "amount of force used, the absence of any physical contact or handcuffs, and duration of the stop are consistent with a valid investigatory stop and not a formal arrest," because the officer "did not place the plaintiff in handcuffs[,] . . . [or] draw his firearm. . .[,] only one or two officers were involved in the actual stop," the officer did not have "any physical contact with [plaintiff] during the stop, which lasted for no more than twenty-five minutes" and "[d]uring the stop, [officer] investigated the plaintiff's claims and freed her upon verifying that information.").

Wade's reliance on *Palmer v. Dots, LLC*, No. HHDCV116020710S, 2014 WL 4494536, at *1 (Conn. Super. Ct. Aug. 4, 2014), is unavailing. (ECF No. 102 at 25–26.) Wade chiefly relies on the Connecticut Superior Court's determination that summary judgment on a false imprisonment claim under *Terry v. Ohio* was not warranted because the police officers had not

sufficiently demonstrated that "plaintiff was acting in a manner which could rise to the officers' belief that their safety or that of others was in any danger, that the plaintiff was attempting to flee the store, or that the plaintiff had a weapon on her person." *Palmer*, 2014 WL 4494536, at *8. *Palmer* involved not only an investigatory "stop" of a larceny suspect but also a frisk of her person and a search of her handbag. *See id.* at *1. The stop and the frisk are governed by separate standards under *Terry*. *See Elmore*, 482 F.3d at 178 ("[P]olice may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, *and* may frisk him if they reasonably believe he is armed and dangerous.") (emphasis added). Because no frisk or search was involved here and the mall security personnel and Officer Decker had reasonable suspicion to believe that a crime had been committed, they were authorized to stop Wade for questioning notwithstanding the fact that Wade did not flee and they did not suspect him of being armed.[13]

Because mall security and Officer Decker had reasonable suspicion to stop Wade, I would grant summary judgment to GGP on Wade's false imprisonment claim.

### 4. *Negligent Infliction of Emotional Distress*

To prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the

---

[13] In *State v. Whitfield*, 26 Conn. App. 103 (1991), which GGP cites, the parties did not dispute that a police officer had a reasonable suspicion that justified briefly detaining the defendant. *Id.* at 113. Nonetheless, the Appellate Court recognized that the officer responding to a mall disturbance who received descriptions of the individuals responsible had reasonable suspicion to stop the defendant to examine an air rifle in his possession and determine if it was nonlethal and legally purchased. *Id.* at 110–111. This type of limited stop is all the evidence shows here.

plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). Thus, "[t]he plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Davis v. Davis*, 112 Conn. App. 56, 68 (2009) (quoting *McNamara v. Tournament Players Club of Connecticut, Inc.*, 270 Conn. 179, 197 (2004)). Wade argues that summary judgment is not appropriate because Davis and Vieweg's conduct was "unreasonable" and, by adopting Santos' and Anes' "false statement without questioning its veracity," they should "have realized that their conduct created an unreasonable risk of causing emotional distress for Wade." (ECF No. 102 at 32.) I disagree, because the undisputed evidence shows that mall security acted reasonably, and so their conduct did not create an unreasonable risk of emotional distress.

As discussed at length above, the undisputed evidence shows that Vieweg and Davis acted appropriately. (As noted earlier, the parties point to no evidence in the record regarding specific conduct by Crosby.) Santos called mall security to report there was a gentleman outside Kay Jewelers who had previously been in Kay Jewelers about week prior with credit cards and that the Kay Jewelers employees thought he might do a "grab-and-run." (Def.'s L.R. 56(a)1 Stmt. ¶ 1; Pl.'s L.R. 56(a)2 Stmt. ¶ 1.) Though Wade charges that "Davis and Vieweg adopted Santos' and Anes' false statement without questioning its veracity, in reckless disregard of whether the statement was false," (ECF No. 102 at 32), as already noted, they had no reason to question the report's veracity and, in fact the unchallenged evidence shows that they took steps to confirm it by reporting to the Kay Jewelers store in person after receiving the call and interviewing Santos, the caller. (Def.'s L.R. 56(a)1 Stmt. ¶ 2; Pl.'s L.R. 56(a)2 Stmt. ¶ 2; ECF No. 97-5, Santos Dep. Tr. 40:23–41:21, 48:3-7; ECF No. 97-7, Davis Dep. Tr. 16:1-14.) Accordingly, regardless of whether Vieweg assisted Officer Decker to stop Wade by identifying him or Davis independently stopped

Wade, Vieweg and Davis acted reasonably in stopping Wade to allow a law enforcement officer, Officer Decker, to confirm the situation and Wade's identity. Even if Davis and Vieweg "surround[ed] Wade," as he claims in his brief (ECF No. 102 at 32), such conduct would still be reasonable as the undisputed evidence shows that Vieweg and Davis stood back several feet from Officer Decker and Wade while Officer Decker checked Wade's identification. (Def.'s L.R. 56(a)1 Stmt. ¶ 6; Pl.'s 56(a)2 Stmt. ¶ 6 (admitting that Davis and Vieweg "stood several feet away while MPD Decker spoke briefly with Plaintiff and checked Plaintiff's identification with Manchester police dispatch"); ECF No. 97-8, Vieweg Dep. Tr. 61:10-11 ("[Davis and Vieweg] were behind Decker about five to eight feet.") (cited in ECF No. 102 at 32); *compare* ECF No. 97-2, Wade (May 2017) Dep. Tr. 40:25–41:4 ("The police, the security officer on his bike beside the police, and the other lady, she beside me on this side. And Mr. Decker in front of me, and the other, the security officer on the little thing that he ride was on there.") (cited in ECF No. 102 at 18).) It is hard to see what Vieweg or Davis could have done more reasonably while still carrying out their duties promptly to investigate reports of criminal activity.

The undisputed evidence does not support any inference that Davis, Vieweg, or any other PSC security guard should have realized that their conduct involved an unreasonable risk of causing emotional distress. Accordingly, even if the PSC personnel were GGP's agents, summary judgment would nonetheless be warranted on Wade's claim for negligent infliction of emotional distress against GGP. *See McNamara v. Tournament Players Club of Connecticut, Inc.*, 270 Conn. 179, 197 (2004) (affirming grant of summary judgment on negligent infliction of emotional distress claim where there was "no basis for a rational inference" that issuing a letter rejecting plaintiff's application to a golf club rose to conduct involving an unreasonable risk of causing emotional distress that might result in illness or bodily harm); *Bank of New York Mellon v. Worth*,

No. 3:13-CV-1489 (MPS), 2016 WL 1048742, at *11 (D. Conn. Mar. 14, 2016) (granting summary judgment on negligent infliction of emotional distress claim where there was no evidence in the record that bank's properly-brought foreclosure action and its agents' inspection of the property "created an unreasonable risk of causing [counterclaim plaintiff] emotional distress," even if she experienced emotional distress because of the loss of her home).

5. *Negligent Supervision*

To recover on a negligent supervision claim under Connecticut law, "plaintiff must plead and prove that she suffered an injury due to the defendant's failure to supervise an employee whom the defendant had [a] duty to supervise." *Brooks v. Sweeney*, 299 Conn. 196, 209 n.12 (2010) (citing *Roberts v. Circuit–Wise, Inc.*, 142 F. Supp. 2d 211, 214 (D. Conn. 2001)). The injury on a negligent supervision claim must be an injury in tort. *See Deguzman v. Kramer*, No. 3-04-CV-2064 (JCH), 2005 WL 2030447, at *2 (D. Conn. Aug. 23, 2005) ("While no Connecticut case appears to spell out the elements of a claim for negligent supervision, it appears that such a claim must allege an injury in tort."); *Maggipinto v. Ulbrich Stainless Steels & Special Metals, Inc.*, No. CV166009606S, 2017 WL 2111405, at *2 (Conn. Super. Ct. Apr. 20, 2017) (recognizing same). Even assuming that Davis, Crosby, and Vieweg were GGP's employees, I would nonetheless grant summary judgment on Wade's negligent supervision claim against GGP because summary judgment is appropriate on all other tort claims based on the conduct of the supposed employees— Davis, Vieweg, and Crosby. *See Deguzman*, 2005 WL 2030447, at *2 (granting motion to dismiss on negligent supervision claim where no other tort claims were alleged).

B. **PSC's Motion for Summary Judgment**

Because the Court has granted GGP's motion for summary judgment in its favor, PSC's motion seeking summary judgment in GGP's favor is DENIED as moot, as it seeks the same relief.

(ECF No. 95.)  This does not end the third-party practice, however, due to GGP's third-party complaint.  (ECF No. 57.)  Although GGP's common law and contractual indemnification claims against PSC are largely dependent on GGP's ultimate liability to Wade, GGP also seeks indemnification for any attorney's fees and costs incurred "as a result of" the plaintiff's claim and the underlying allegations.  (ECF No. 57 at ¶¶ 23, 35.)  Accordingly, GGP shall file within **21 days** a short notice on the docket indicating what relief, if any, it wishes to pursue in light of this ruling. The Court may then direct PSC to respond.  If GGP indicates that it does not wish to continue pursuing any relief on its third-party complaint or does not respond by the deadline, the Court will dismiss the third-party complaint.

## IV.    Conclusion

For the foregoing reasons, GGP's motion for summary judgment is GRANTED (ECF No. 97), and PSC's motion for summary judgment is DENIED as moot (ECF No. 95). GGP shall file on the docket within **21 days** a short notice on what relief in its third-party complaint (ECF No. 57) it wishes to pursue in light of this ruling. If GGP indicates that it does not wish to continue pursuing any relief on its third-party complaint or does not respond by the deadline, the Court will dismiss the third-party complaint.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              March 27, 2019